*Michigan Supreme Court*
*Lansing, Michigan 48909*

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

# Opinion

**FILED JULY 25, 2002**

JANICE TERRIEN, THOMAS HAGEN, and
JANET THOMAS,

    Plaintiffs-Appellants,

v                       No. 115924

LAUREL ZWIT, TIM ZWIT, KEN CLARK,
and NICCI CLARK,

    Defendants-Appellees.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave in this case to consider whether covenants permitting only residential uses, and expressly prohibiting commercial, industrial, or business uses, preclude the operation of a "family day care home." We also granted leave to consider whether a covenant precluding such an operation is unenforceable as violative of Michigan "public policy." The circuit court granted summary disposition in

favor of defendants, holding that a covenant precluding the operation of a "family day care home" is contrary to the public policy of the state of Michigan. The Court of Appeals affirmed, but for a different reason. It held that the operation of a "family day care home" is not precluded by such covenants. It concluded that, because the operation of a "family day care home" is a residential use, it could not also be a commercial or business use because the two uses are mutually exclusive. 238 Mich App 412; 605 NW2d 681 (1999). We respectfully disagree with both lower courts. A covenant barring any commercial or business enterprises is broader in scope than a covenant permitting only residential uses. Furthermore, covenants such as these do not violate Michigan public policy and are enforceable. Accordingly, we reverse the decision of the Court of Appeals and remand this case to the circuit court for entry of an order granting summary disposition in favor of plaintiffs.

## I. FACTS AND PROCEDURAL HISTORY

All parties in this case own homes within the Spring Valley Estates subdivision in Fruitland Township.[1] Defendants each operate licensed "family day care homes" pursuant to MCL

---

[1] In the circuit court, the parties stipulated the essential facts. It is also undisputed that defendants ran the "family day care homes" for profit.

2

722.111 *et seq.* in their homes within the subdivision.[2]  The

subdivision is subject to the following covenants:

> 1. No part of any of the premises above described may or shall be used for other than private residential purposes.

> * * *

> 3. No lot shall be used except for residential purposes.

> * * *

> 14. No part or parcel of the above-described premises shall be used for any commercial, industrial, or business enterprises nor the storing of any equipment used in any commercial or industrial enterprise.[3]

Plaintiffs sought an injunction prohibiting the continued

operation of defendants' "family day care homes."  The parties

agreed to file cross-motions for summary disposition before

engaging in discovery.  Plaintiffs moved for partial summary

disposition pursuant to MCR 2.116(C)(9), and defendants moved

for summary disposition pursuant to MCR 2.116(C)(8) and (10).

The circuit court denied plaintiffs' motion and granted

defendants' motion, finding that a "covenant precluding the

operation of a family day care home in a residential setting

---

[2] "Family day care home" means a "private home in which 1 but fewer than 7 minor children are received for care and supervision for periods of less than 24 hours a day . . . ." [MCL 722.111(f)(iii).]

[3] These covenants are in the form of plat restrictions that attached to the parties' property by operation of the doctrine of reciprocal negative easement.

3

is contrary to the public policy of the State of Michigan." The Court of Appeals affirmed this decision. However, instead of invalidating the covenants as being against public policy, the Court concluded that defendants' operation of "family day care homes" did not violate the covenants. This Court granted plaintiffs' application for leave to appeal.

## II. STANDARD OF REVIEW

Because the parties have stipulated the essential facts, our concern here is only with the law: specifically, whether covenants permitting only residential uses, and expressly prohibiting commercial, industrial, or business uses, preclude the operation of a "family day care home," and, if so, whether such a restriction is unenforceable as against "public policy." These are questions of law that are reviewed de novo, *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001), which standard is identical to the standard of review for grants or denials of summary disposition. *MacDonald v PKT, Inc*, 464 Mich 322, 332; 628 NW2d 33 (2001).

## III. ANALYSIS

### A. COVENANTS

We granted leave in this case to consider whether the operation of a "family day care home" violates covenants permitting only residential uses and prohibiting commercial, industrial, or business uses. Further, assuming *arguendo* that such activities do violate the covenant, the question becomes

4

whether the covenant is unenforceable because it violates some "public policy" in favor of day care facilities.  In *Beverly Island Ass'n v Zinger*, 113 Mich App 322; 317 NW2d 611 (1982), the Court of Appeals addressed a somewhat similar issue. There, the Court, faced with a narrower covenant that permitted only residential uses, concluded that the operation of a "family day care home" did not violate that covenant.[4] Stressing the relatively small scale of the particular day care operation and that "[t]he only observable factor which would indicate to an observer that defendants do not simply have a large family is the vehicular traffic in the morning and afternoon when the children arrive and depart," *id.* at 328, the Court found this sort of day care use to be residential in nature, and thus  not a use in violation of the covenant.

Beverly Island was relied upon by the Court of Appeals in the instant matter to conclude that the day care use here was not violative of the covenants at issue.  However, such reliance was misplaced, in our judgment, because, the covenant at issue in *Beverly Island* merely prohibited nonresidential uses, whereas the covenants at issue here prohibit not only nonresidential uses, but also any commercial, industrial, or

---

[4] The covenant at issue in *Beverly Island, supra* at 324, provided in relevant part that "[n]o lot or building plot shall be used except for residential purposes."

business uses as well.  There is a significant distinction between such restrictions, as more is prohibited in our case then was prohibited in *Beverly Island*.  Not only did defendants in this case covenant not to use their property for nonresidential uses, but they also covenanted not to use their property for commercial, industrial, or business uses.

Interestingly, the *Beverly Island* Court itself recognized the distinction between a covenant permitting only residential uses and one that also expressly prohibits commercial, industrial, or business uses.  Before it even began its analysis, the *Beverly Island* Court noted that the covenant at issue "permits residential uses rather than prohibiting business or commercial uses."  *Id*. at 326.  It further recognized that a "restriction allowing residential uses permits a wider variety of uses than a restriction prohibiting commercial or business uses."  *Id*.  While the former proscribes activities that are nonresidential in nature, the latter proscribes activities that, although perhaps residential in nature, are also commercial, industrial, or business in nature as well.  The distinction between the covenants at issue here and the one at issue in *Beverly Island* was not viewed as persuasive by the Court of Appeals in this case.[5]

---

[5] The Court referenced the statement made by the *Beverly Island* Court that recognized the difference between such

6

The Court of Appeals in this case reasoned that, because the operation of a "family day care home" does not violate a covenant permitting only residential uses,[6] the operation of a "family day care home" also does not violate a covenant prohibiting commercial, industrial, or business uses. We disagree with such reasoning. Because these are separate and distinct covenants, that an activity complies with one does not necessarily mean that the same activity complies with the other. In other words, an activity may be both residential in nature and commercial, industrial, or business in nature.

Therefore, *Beverly Island* simply does not answer the question raised here. We must determine whether the operation of a "family day care home" violates covenants prohibiting both nonresidential uses and commercial, industrial, or business uses. We find that it does.

The operation of a "family day care home" for profit is a commercial or business use of one's property. We find this to be in accord with both the common and the legal meanings of

---

covenants, but stated that this statement was "mere dicta," and thus refused to follow it. *Terrien, supra* at 416-417.

[6] The only issue raised by this case is whether the operation of a "family day care home" violates covenants permitting only residential uses *and* prohibiting commercial, industrial, or business uses. Accordingly, that is the only issue we address. In particular, we do not address whether the operation of a "family day care home" violates the single covenant permitting only residential uses, i.e., the issue addressed by the Court of Appeals in *Beverly Island.*

the terms "commercial" and "business." "Commercial" is commonly defined as "able or likely to yield a profit." *Random House Webster's College Dictionary* (1991). "Commercial use" is defined in legal parlance as "use in connection with or for furtherance of a profit-making enterprise." Black's Law Dictionary (6th ed). "Commercial activity" is defined in legal parlance as "any type of business or activity which is carried on for a profit." *Id*. "Business" is commonly defined as "a person . . . engaged in . . . a service." *Random House Webster's College Dictionary* (1991). "Business" is defined in legal parlance as an "[a]ctivity or enterprise for gain, benefit, advantage or livelihood." Black's Law Dictionary (6th ed).

This Court has previously discussed the meaning of "commercial" activity in a related context. In *Lanski v Montealegre*, 361 Mich 44; 104 NW2d 772 (1960), this Court addressed whether the operation of a nursing home was in violation of a reciprocal negative easement prohibiting commercial activity upon certain property. We determined that it was, observing that the circumstances were indicative of a "general plan for a *private resort area*" and that this suggested that a broad definition of "commercial" activity was intended. *Id*. at 49 (emphasis in the original). Therefore, "[i]n its broad sense commercial activity includes any type of

8

business or activity which is carried on for a profit." *Id*. We concluded that the operation of a nursing home was a commercial use because a fee was charged, a profit was made, the services were open to the public, and such an operation subtracted from the "general plan of the private, noncommercial resort area originally intended." *Id*. at 50.

The facts here indicate that a similar definition of commercial activity was intended. Not only does the covenant here prohibit commercial or business activities, it also prohibits the mere "storing of any equipment" used in such activities. This is a strong and emphatic statement of the restrictions' intent to prohibit any type of commercial or business use of the properties. Defendants here, through the operation of "family day care homes" are providing a service to the public in which they are making a profit.[7] Clearly, such use of their properties is a commercial or business use, as those terms are commonly and legally understood.

It is of no moment that, as defendants assert, the "family day care homes" cause no more disruption than would a large family or that harm to the neighbors may not be tangible. As we noted in *Austin v VanHorn*, 245 Mich 344, 347; 222 NW 721 (1929), "the plaintiff's right to maintain the restrictions is not affected by the extent of the damages he

---

[7] We note that the operation of a "family day care home" requires a license and is regulated by the state.

might suffer for their violation." This all comes down to the well-understood proposition that a breach of a covenant, no matter how minor and no matter how *de minimis* the damages, can be the subject of enforcement. As this Court said in *Oosterhouse v Brummel,* 343 Mich 283, 289; 72 NW2d 6 (1955), "'If the construction of the instrument be clear and the breach clear, then it is not a question of damage, but the mere circumstance of the breach of the covenant affords sufficient ground for the Court to interfere by injunction.'" (Citations omitted.)

### B. PUBLIC POLICY

Defendants further contend that, even if the covenant here *does* prohibit the operation of these day care facilities, such a restriction should be unenforceable as against "public policy." The circuit court agreed, while the Court of Appeals did not find it necessary to reach this issue.[8]

To determine whether the covenant at issue runs afoul of

---

[8] The Court of Appeals indicated that Michigan public policy does, in fact, favor "family day care homes." It then concluded that, in light of this public policy, as well as the fact that the operation of a "family day care home" is residential in nature, defendants' property use did not violate the covenants. However, rather than relying on public policy to conclude that a covenant prohibiting the operation of a "family day care home" was unenforceable, as the circuit court did, the Court of Appeals relied on public policy to conclude that the covenants here did not prohibit the operation of a "family day care home."

10

the public policy of the state,[9] it is first necessary to discuss how a court ascertains the public policy of the state. In defining "public policy," it is clear to us that this term must be more than a different nomenclature for describing the personal preferences of individual judges, for the proper exercise of the judicial power is to determine from objective legal sources what public policy *is*, and not to simply assert what such policy *ought* to be on the basis of the subjective views of individual judges. This is grounded in Chief Justice Marshall's famous injunction to the bench in *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), that the duty of the judiciary is to assert what the law "is," not what it "ought" to be.

In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law.[10]  See *Twin City Pipe Line Co v Harding Glass Co,*

---

[9] Covenants that are against "public policy" are unenforceable. "The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests." *Twin City Pipe Line Co v Harding Glass Co,* 283 US 353, 356-357; 51 S Ct 476; 75 L Ed 1112 (1931); *Skutt v Grand Rapids*, 275 Mich 258, 264; 266 NW 344 (1936).

[10]  For instance, a racial covenant would be clearly unenforceable on this basis.  See *Shelley v Kraemer*, 334 US 1;

283 US 353, 357; 51 S Ct 476; 75 L Ed 1112 (1931). The public policy of Michigan is *not* merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law. There is no other proper means of ascertaining what constitutes our public policy.[11] As this Court has said previously:

> "As a general rule, making social policy is a job for the Legislature, not the courts. This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: 'The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's.'" [*Van v Zahorik*, 460 Mich 320, 327; 597 NW2d 15 (1999)(citations omitted).]

Instructive to the inquiry regarding when courts should refrain from enforcing a covenant on the basis of public policy is *W R Grace & Co v Local Union 759*, 461 US 757, 766; 103 S Ct 2177; 76 L Ed 2d 298 (1983), in which the United States Supreme Court said that such a public policy must not only be "explicit," but that it also "must be well defined and

---

68 S Ct 836; 92 L Ed 1161 (1948)(interpreting the Equal Protection Clause, US Const, Am XIV); *Hurd v Hodge*, 334 US 24; 68 S Ct 847; 92 L Ed 1187 (1948)(interpreting the Civil Rights Act of 1866); the federal Fair Housing Act, 42 USC 3601 *et seq.;* Michigan's Civil Rights Act, MCL 37.2101 *et seq.;* and the housing provisions of Michigan's Civil Rights Act, MCL 37.2501 *et seq.*

[11] We note that, besides constitutions, statutes, and the common law, administrative rules and regulations, and public rules of professional conduct may also constitute definitive indicators of public policy.

dominant . . . .″[12]   As the United States Supreme Court has further explained:

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.  As the term "public policy" is vague, there must be found definite indications in the law of the sovereign to justify the invalidation of a contract as contrary to that policy. [*Muschany v United States*, 324 US 49, 66; 65 S Ct 442; 89 L Ed 744 (1945).][13]

This Court has found no "definite indications in the law" of

---

[12] In *Eastern Ass'n Coal Corp v United Mine Workers of America, District 17*, 531 US 57, 68; 121 S Ct 462; 148 L Ed 2d 354, Justice Scalia observed in a concurring opinion that "[t]here is not a single decision, since this Court washed its hands of general common-lawmaking authority, in which we have refused to enforce on 'public policy' grounds an agreement that did not violate, or provide for the violation of, some positive law." [Citation omitted.]  "The problem with judicial intuition of a public policy that goes beyond the actual prohibitions of the law is that there is no way of knowing whether the apparent gaps in the law are intentional or inadvertent."  *Id*.

[13] "The meaning of the phrase 'public policy' is vague and variable; courts have not defined it, and there is no fixed rule by which to determine what contracts are repugnant to it."  *Twin City*, *supra* at 356.  As an illustration of such vagueness, "public policy" has been described as the "community common sense and common conscience" and as "abid[ing] only in the customs and conventions of the people— in their clear consciousness and conviction of what is naturally and inherently just and right between man and man."  *Skutt v Grand Rapids*, 275 Mich 258, 264; 266 NW 344 (1936).  Justice Kelly's dissenting opinion relies upon this definition of public policy in concluding that the covenant here is unenforceable.  However, we disagree with such a nebulous definition because it would effectively allow individual judges discretion to substitute their own personal preferences for those of the public expressed through the regular processes of the law.  Instead, we believe that public policy is defined by reference to the laws actually enacted into policy by the public and its representatives.

Michigan to justify the invalidation of a covenant precluding the operation of "family day care homes."  Indeed, nothing has been cited, nor does our research yield anything in our constitutions, statutes, or common law that supports defendants' view that a covenant prohibiting "family day care homes" is contrary to the public policy of Michigan.

Defendants contend that "family day care homes" are a "favored use" of property, and a restriction against such a use, therefore, violates public policy.[14]  Amorphous as that claim may be, even if it is true that "family day care homes" may be permitted or even encouraged by law, it does not follow that such use is a favored one.  Additionally, that "family day care homes" are *permitted* by law does not indicate that private covenants barring such business activity are contrary to public policy.[15]  What is missing from defendants' argument

_____

[14] The county zoning act, MCL 125.216g(2), and the township zoning act, MCL 125.286g(2), state that a "family day care home" "shall be considered a residential use of property for the purposes of zoning . . . ."

[15] This Court has held that the favoring of a use does not mean that such a use cannot be denied with regard to a particular parcel of land. *Kropf v Sterling Heights*, 391 Mich 139, 156-157; 215 NW2d 179 (1973).  In *Kropf,* this Court concluded that a municipality can, by way of a local zoning ordinance, prohibit a "favored use" on a particular parcel of land.  Similarly, private parties can, by way of a covenant, agree to prohibit a "favored use" on a particular parcel of land.  Therefore, *even if* the operation of "family day care homes," is a "favored use," this is an insufficient reason for disregarding a covenant prohibiting the operation of "family day care homes" on the subject property.  See *Johnstone v Detroit, G H & M R Co*, 245 Mich 65, 73-74; 222 NW 325 (1928).

14

is some "definitive indication" that to exclude "family day care homes" from an area by contract is incompatible with the law.[16] There is a significant distinction between something being permitted or even encouraged by law and something being required or prohibited by law.

To fail to recognize this distinction would accord the judiciary the power to examine the wisdom of private contracts in order to enforce only those contracts it deems prudent. However, it is not "the function of the courts to strike down private property agreements and to readjust those property rights in accordance with what seems reasonable upon a detached judicial view." *Oosterhouse, supra* at 289-290. Rather, absent some specific basis for finding them unlawful, courts cannot disregard private contracts and covenants in order to advance a particular social good. See *Johnstone v Detroit, G H & M R Co*, 245 Mich 65, 73-74; 222 NW 325 (1928).[17] As we said in *Oosterhouse, supra* at 288, "[w]e do not substitute our judgment for that of the parties, particularly

---

[16] For example, a covenant requiring "x" or "y" would be incompatible with a law or constitutional provision prohibiting "x" or "y;" and a covenant prohibiting "x" or "y" would be incompatible with a law or constitutional provision requiring "x" or "y."

[17] In *Johnstone,* this Court concluded that the owners of property in a subdivision subject to a covenant restricting use of property to residence purposes were entitled to just compensation upon the taking of part of such subdivision for public use in violation of such restriction.

where, as in the instant case, restrictive covenants are the means adopted by them to secure unto themselves the development of a uniform and desirable residential area." Instead, we conclude that, if covenants that prohibit "family day care homes" should not be enforced on public policy grounds, such a decision should come from the Legislature, not the judiciary.[18] The Legislature may think that it is wise to bar such covenants, but until it does so, we cannot say that they are contrary to public policy. See *Muschany, supra* at 65.

Further, although the circuit court and the Court of Appeals in this case considered what they viewed as the public policy in favor of "family day care homes," they neglected to even mention the strong competing public policy, which *is* well-grounded in the common law of Michigan, supporting the right of property owners to create and enforce covenants affecting their own property.[19] *Wood v Blancke*, 304 Mich 283,

_____

[18] For example, the California, Minnesota, and New Jersey Legislatures have enacted provisions voiding any covenants that prohibit "family day care homes." See Cal Health & Safety Code, § 1597.40; Minn Stat 245A.11(2); NJ Stat 40:55D-66.5b(a).

[19] Indeed, the importance of enforcing covenants is deeply entrenched in our common law. As early as 1928, it has been expressly held to be the common law of this state. *Johnstone, supra* at 74. Undergirding this right to restrict uses of property is, of course, the central vehicle for that restriction: the freedom of contract, which is even more deeply entrenched in the common law of Michigan. See *McMillan v Mich S & N I R Co*, 16 Mich 79 (1867). Justice Kelly's

287-288; 8 NW2d 67 (1943). It is a fundamental principle, both with regard to our citizens' expectations and in our jurisprudence, that property holders are free to improve their property. We have said that property owners are free to attempt to enhance the value of their "property in any lawful way, by physical improvement, psychological inducement, *contract*, or otherwise." *Johnstone, supra* at 74-75 (emphasis added). Covenants running with the land are legal instruments utilized to assist in that enhancement. A covenant is a contract created with the intention of enhancing the value of property, and, as such, it is a "valuable property right." *City of Livonia v Dep't of Social Services*, 423 Mich 466, 525; 378 NW2d 402 (1985).[20] "The general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City, supra* at 356; see also *Port Huron Ed Ass'n v Port Huron*

dissenting opinion dismisses these public policies in a short footnote.

Further, although this case implicates several claims to public policy, our resolution of this case does not require us to balance competing public policies because, as discussed above, the claim that a covenant precluding the operation of "family day care homes" violates public policy is flawed.

[20] "Restrictions for residence purposes are particularly favored by public policy and are valuable property rights." *City of Livonia, supra* at 525.

17

*Area School Dist*, 452 Mich 309, 319; 550 NW2d 228 (1996), quoting *Dep't of Navy v Federal Labor Relations Authority*, 295 US App DC 239, 248; 962 F2d 48 (1992)(discussing the "fundamental policy of freedom of contract" under which "parties are generally free to agree to whatever specific rules they like").

Moreover, "[r]estrictions for residence purposes, if clearly established by proper instruments, are favored by definite public policy. The courts have long and vigorously enforced them by specific mandate." *Johnstone, supra* at 74. The covenants at issue here are of this sort. They expressly prohibit nonresidential uses, as well as commercial, industrial, or business uses. Clearly, the intention was to limit the use of the property in order to maintain a residential neighborhood of a specific character. As we said in *Signaigo v Begun*, 234 Mich 246, 250; 207 NW 799 (1926), "[t]he right, if it has been acquired, to live in a district uninvaded by stores, garages, business and apartment houses is a valuable right." Further, this Court "has not hesitated in proper cases to restrain by injunction the invasion of these valuable property rights." *Id*. at 251. Moreover, the "nullification of [such] restrictions [would be] a great injustice to the owners of property," *Wood, supra* at 287, because "the right of privacy for homes is a valuable right." *Johnstone, supra* at 74. It is the function of the courts to

18

protect such rights through the enforcement of covenants. *Wood, supra* at 287-288.

Here, we conclude that a covenant precluding the operation of a "family day care home" is not violative of the public policy of our state because there are no "definite indications" in our law of any public policy against such a covenant. Indeed, there is considerable public policy regarding the freedom of contract that affirmatively supports the enforcement of such a covenant.

IV. RESPONSE TO DISSENTS

A. JUSTICE KELLY'S DISSENT

1. Covenants

Justice Kelly's dissent first concludes that "family day care homes" are "residential in nature." *Post* at 1. However, as we have already pointed out, the issue here is not whether the operation of a "family day care home" is a residential use. Rather, the issue is whether such an operation is a commercial or business use. As we explained above, residential and commercial or business uses of property are not mutually exclusive; an activity may be both residential in nature and commercial or business in nature. Therefore, the dissent's assertion that "family day care homes" are residential in nature simply is irrelevant here, where the issue is whether the operation of a "family day care home"

19

violates a covenant prohibiting *commercial or business* uses.[21]

The dissent next concludes that "family day care homes" "do not violate restrictive covenants prohibiting commercial and business use." *Post* at 1. Inherent in this conclusion is that the operation of a "family day care home" is not a commercial or business use.[22] As discussed above, we disagree. The dissent criticizes us for placing "great weight on compensation," *post* at 2, in determining that the operation of a "family day care home" *is* a commercial or business use. However, it provides no explanation as to why this is an inappropriate consideration. In *Lanski, supra* at 49, in determining that the operation of a nursing home was a commercial use, this Court observed that "[a] fee is charged and a profit is made." The same is true here. The intent to make a profit is quite obviously an important element in identifying what constitutes a commercial or business

---

[21] The dissent again fails to recognize this distinction when it states later that "it is impossible to conclude from the record that the family day-care homes do not conform to the ordinary and common meaning of 'use for residential purposes.'" *Post* at 4.

[22] We find it interesting that, although the dissent states that "family day care homes" are "residential in nature" and that they "do not violate restrictive covenants prohibiting commercial and business use," *post* at 1, the dissent never comes right out and states that the operation of a "family day care home" is not a commercial or business use. Perhaps, such a straightforward statement of the dissent's ultimate conclusion would call attention to the flaws underlying such a conclusion.

enterprise.[23]

The dissent next asserts that "land use should be characterized according to how the activity involved there affects the general plan of the area" rather than "the narrow approach of the majority." *Post* at 3. However, the approach that this majority has adopted is simply that, when parties enter into contracts to prohibit commercial or business uses on their properties, commercial or business uses on their properties will be prohibited.

Further, lest the dissent obscure this issue, we point out once more that the covenant before this Court states that the parties' properties are not to "be used for any commercial, or business enterprises." It does not state, as the dissent would have us understand, that the parties' properties are not to be used for any commercial, or business

---

[23] The dissent relies on *City of Livonia* in an attempt to downplay the relevance of an intent to make a profit. However, the dissent fails to recognize a critical distinction between *City of Livonia* and the present case. In *City of Livonia,* the issue was whether the operation of an adult foster care home violated a covenant prohibiting *nonresidential* use, while the issue in the instant case is whether the operation of a "family day care home" violates a covenant prohibiting *commercial or business* uses. The Court in *City of Livonia* concluded that the operation of an adult foster care home was not a nonresidential use, despite the fact that its patients were required to pay for goods and services obtained there. We agree that the receipt of compensation does not necessarily make an activity nonresidential in nature. However, whether compensation is received plays a far more critical role in the determination of whether an activity is a commercial or business use.

21

enterprises that affect the general plan of the area or has a visible adverse effect on the residential character of the neighborhood.  See *post* at 3, 6.  Under the plain language of the covenant before this Court, not the covenant apparently preferred by the dissent, the parties' properties may not be used to operate a commercial or business enterprise.  Period.[24] In an effort apparently to "improve" upon the actual contract created by the parties, the dissent reads words into the covenant that simply are not there.[25]

The dissent justifies its amending from the bench by asserting that "[t]he absence of a definition in the restrictive covenants" of the terms "commercial, industrial, or business enterprises" leaves these terms ambiguous, and

---

[24]  The dissent's statement that the land use here is not commercial or business in nature because "no showing has been made that the operation of defendants' family day-care homes had any effect on the overall residential character of their neighborhood," *post* at 3-4, is, therefore, a non-sequitur. Further, as we have explained, plaintiffs' right to enforce the covenant, as written, does not depend on whether defendants' violations of the covenant have harmed plaintiffs, although the fact that plaintiffs have initiated this lawsuit and pursued it to this Court suggests that the impact of defendants' activities upon plaintiffs are not viewed as benignly by the latter as they are by the dissent.

[25] The dissent characterizes the effect of our decision as imposing an "absolute prohibition" upon "family day care homes" on the parties' properties, and further characterizes this as the "majority's absolute prohibition." *Post* at 6. We feel impelled, however, to point out to the dissent that this is the *parties',* not the "*majority's*," prohibition.  The parties, not this Court, are the lawmakers with regard to the terms of their own contracts.

22

thus "opens the terms to judicial interpretation." *Post* at 6.
We find this to be a remarkable proposition of law, namely,
that the lack of an explicit internal definition of a term
somehow equates to ambiguity—an ambiguity that apparently, in
this case, allows a court free rein to conclude that a
contract means whatever the court wants it to mean.  Under the
dissent's approach, any word that is not specifically defined
within a contract becomes magically ambiguous.[26]  If that were
the test for determining whether a term is ambiguous, then
virtually all contracts would be rife with ambiguity and,
therefore, subject to what the dissent in "words mean whatever
I say they mean" fashion describes as "judicial
interpretation."  However, fortunately for the ability of
millions of Michigan citizens to structure their own personal
and business affairs, this is not the test.  As this Court has
repeatedly stated, the fact that a contract does not define a
relevant term does not render the contract ambiguous.
*Henderson v State Farm Fire & Casualty Co*, 460 Mich 348, 354;
596 NW2d 190 (1999).[27]  Rather, if a term is not defined in a

---

[26] Presumably, the dissent would apply this same novel approach to the interpretation of statutes.  We note that this would be contrary to MCL 8.3a, which provides that "[a]ll words and phrases shall be construed and understood according to the common and approved usage of the language . . . ."

[27] This Court has further observed with respect to insurance contracts, "[o]mitting the definition of a word that has a common usage does not create an ambiguity within the policy."  *Group Ins Co v Czopek*, 440 Mich 590, 596; 489 NW2d

contract, we will interpret such term in accordance with its "commonly used meaning." *Id.*; *Frankenmuth Mutual Ins Co v Masters*, 460 Mich 105, 113-114; 595 NW2d 832 (1999).

The contract in this case clearly prohibits commercial or business uses on the covered properties. Equally clearly, the operation of a "family day care home" that makes a profit by providing a service to the public is a commercial or business use. That these interpretations should appear to the dissent to be overly "conclusory" is only, perhaps, because they involve such simple and unremarkable propositions of law.

## 2. PUBLIC POLICY

The dissent also concludes that, even if the covenant here *does* preclude the operation of "family day care homes," such a preclusion is contrary to public policy, and thus unenforceable. *Post* at 7. As we have already made clear, we respectfully disagree.

The dissent suggests that we unnecessarily limit our understanding of public policy to "express statutory mandates." *Post* at 10. However, as we have already explained, our view, as well as that of the United States Supreme Court, is simply that public policy must be derived

444 (1992). "[S]imply because a policy does not define a term does not render the policy ambiguous." *Auto Club Group Ins Co v Marzonie*, 447 Mich 624, 631; 527 NW2d 760 (1994). "Instead, absent a policy definition, terms are 'given a meaning in accordance with their common usage.'" *Id.* (citation omitted).

24

from "definite indications" in the law.  While the dissent would refuse to enforce the instant covenant absent any "definite indication" in the law, much less any "express statutory mandate," that such a covenant contravenes any public policy, we view it as our obligation to enforce a covenant under these circumstances.

As the dissent itself acknowledges, public policy is the "foundation" of our constitutions, statutes, and common law. *Post* at 8.  It is precisely because of this truth that a contract that *does* violate public policy is unenforceable. However, it is also because of this truth that, where an *actual* public policy exists, rather than simply a personal policy preference of a judge, "definite indications" of an actual public policy will be found in our laws.

The dissent asserts that the majority's opinion "eviscerates the public policy doctrine" and is "contrary to this Court's long established practice." *Post* at 1, 12.  Once more, we disagree.  This opinion merely sets forth the unexceptional proposition that an assertion of public policy as a basis for nullifying a contract must, in fact, be grounded in a public policy.  If not grounded in the constitution, the statutes, or the common law of this state, we are curious as to the dissent's basis for asserting that a policy is truly a "public" policy as opposed to merely a judge's own preferred policy.  It is hard to think of a

proposition less compatible with the "rule of law" and more compatible with the "rule of men" than that a judge may concoct "public policies" from whole cloth, rather than from actual sources of the law.[28]

Finally, the dissent concludes that "restrictive covenants prohibiting family day-care homes are contrary to our state's public policy and are unenforceable." *Post* at 10. However, the only evidence that the dissent points to establishes, at most, that "family day care homes" are supported, or even encouraged, by public policy,[29] not that covenants which limit "family day care homes" upon private properties are contrary to public policy. Such evidence

_____

[28] The dissent remarkably criticizes the majority opinion because it will have "negative implications regarding the free use of land," *post* at 12. Needless to say, we have a rather different view than the dissent of what promotes the "free use of land." We respectfully suggest that a legal regime in which contract and property rights are respected is one more conducive to this end than a regime in which contract and property rights are subject to the arbitrary vetoes of judges deriving new "public policies" from their own consciences.

[29] The principal evidence that the dissent marshals for its conclusion that this covenant violates public policy is that the Legislature has chosen to regulate "family day care homes," that the executive branch has established an advisory committee on day care for children, and that the Court of Appeals has said in dictum that "family day care homes" are *favored* by our public policy. See also note 30. It is not clear how any of this evidence "definitely indicates" a public policy *against* covenants that prohibit "family day care homes." Again, even if public policy *does* favor such homes, this is a considerably different proposition from one that private parties are prohibited from freely entering into agreements not to use their properties for the operation of such homes.

26

certainly does not provide any "definite indication" that a covenant, freely entered into by private parties, prohibiting the operation of "family day care homes" on their properties, violates public policy.[30]

In summary, in the name of "public policy"—a "public policy" nowhere to be found in the actual laws of Michigan—the dissent would impose its own preferences for how a contract ought to read in place of the preferences of the parties themselves.[31]

---

[30] The dissent also relies on zoning statutes to reach its conclusion that this covenant violates public policy. *Post* at 9. However, we also question the relevance of this factor. First, these statutes merely provide that "family day care homes" are to "be considered a *residential* use of property for the purposes of *zoning* . . . ." MCL 125.216g(2), MCL 125.286g(2)(emphasis added). They do not state that "family day care homes" are not a *commercial or business* use. Second, it is well settled that zoning statutes do "not purport to regulate private restrictive covenants." *City of Livonia*, *supra* at 525. "'Zoning laws determine property owners' obligations to the community at large, but do not determine the rights and obligations of parties to a private contract.'" *Id.*, quoting *Rofe v Robinson*, 415 Mich 345, 351; 329 NW2d 704 (1982). Therefore, "definitions adopted for legislative purposes in housing codes and zoning ordinances [cannot] be employed in interpreting restrictive covenants." *Oosterhouse*, *supra* at 290.

[31] Concerning the dissent's accusation that this majority "engrafts its own version of what the law should be," and that our opinion is the "embodiment of judge-made law," *post* at 12, in amazement, we can do little more than repeat what we said in *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 762; 641 NW2d 567 (2002), inviting the "reader, and the citizens of Michigan, in evaluating these opinions, to reflect upon" which approach to judging is more conducive to these results—an approach in which "public policy" is determined on the basis of policies actually enacted into law by the representatives of the public, or an approach in which "public policy" is

27

Justice Weaver's dissent sets forth two arguments that have not elsewhere been addressed in this opinion:

First, the dissent suggests that, in order to determine whether an activity is commercial or business in nature, this Court must inquire into the *type* of neighborhood to which the covenant applies. We do not understand the relevance of this inquiry. The covenant here prohibits commercial or business uses. This language could not be more direct or straightforward. We do not understand how, for example, a commercial dry cleaner is transformed from a "business" into a non-"business" because the surrounding neighborhood is middle-income or lower middle-income, because its lots are larger or smaller, because its residents are predominantly younger or older, or because its shrubbery is or is not well-tended. Rather, a business is a business, quite without reference to the type of neighborhood in which it is situated. If there is, in fact, some relevance to be derived from all these things that comprise a neighborhood in defining "business," the dissent does not tell us what this might be. The dissent offers no factors or criteria for a court to evaluate, it offers no guidance as to the particular

---

fashioned out of thin air by judges and used to defeat the contracts and covenants freely entered into by the people of this state.

circumstances that should be reviewed by a court in its analysis, and it offers no direction regarding when a court should conclude that a 7-11 store, a beauty shop, or an auto body facility has been transformed into a non-"business" because of its location.

Indeed, the irrelevance of the dissent's inquiry is underscored by the obvious fact that the covenant here was only applied specifically to a *single* "neighborhood"—what was within the scope of the covenant. There are not one hundred different neighborhoods here in which "business," at least in the dissent's view, might mean something different in each instance. Rather, there is a *one* neighborhood to which the covenant applies, and there is not the slightest indication in the covenant that this altogether ordinary term, "business," was intended to mean anything other than what every person in Fruitland Township, or anywhere else in the state of Michigan, would understand it to mean. One would suppose that, had the type of neighborhood been relevant to an understanding of "business," the parties who joined into this covenant might have offered some guidance in this regard, since there is only one "type of neighborhood" to which such guidance would have been required. However, no evidence exists that these parties intended *any* of their words to have secret meanings, or to communicate something other than their ordinary meanings.

Further, we are not persuaded by the case cited by the

29

dissent in support of its proposition that whether an activity constitutes a "business" depends on the type of neighborhood to which the covenant applies. The dissent cites *Brown v Hojnacki*, 270 Mich 557, 561; 259 NW 152 (1935), in which this Court concluded that it was "too plain for argument" that the activity at issue there, a massage parlor, constituted a "business house of any kind," and thereby violated a covenant prohibiting the latter. In reaching this conclusion, the Court nonetheless asserted that it was appropriate to consider the "'location and character of the entire tract of land.'" *Id.* at 560-561. In light of the fact that the Court did not actually rely upon any such factor in its opinion, this statement must be viewed as dictum—dictum that apparently has not been reasserted since in this Court.

Second, the dissent contends that our opinion will "prohibit a stockbroker from working from home on his computer, an author from writing at his home office, an attorney from writing on billable time at home, or even a neighborhood child from mowing his family's and neighbors' lawns for pay." *Post* at 3. Needless to say, we have not been presented with any of these cases, and will await their appeals before deciding them. However, where agreements that have been freely reached prove flawed, they can be undone or

modified through the same process.[32]  Regardless of whether this Court can "improve upon" such agreements, we are unprepared to do so by construing words to mean what they plainly do not mean.

The essential issue in this case is simply this: "Is a for-profit day-care center a 'business?'"  In our judgment, it is.  In our judgment, the parties to the contract in this case intended that "business" would mean "business."  The approach of the dissent would undermine the stability of property law as well as contract law in Michigan by construing the words of a real estate contract to mean something other than what they clearly mean.[33]

---

[32]  The dissent contends that we have failed to give sufficient consideration to the fact that "the Legislature has concluded that family day care homes within neighborhoods are favored . . . ."  *Post* at 5.  Even assuming that "family day care homes" are "favored" or permitted, the dissent does not explain the significance of this observation.  Unlike the other dissent, which makes this same observation, and concludes as a result that the "public policy" doctrine is implicated, the instant dissent makes no reference whatsoever to the "public policy" doctrine.

[33]  If "business" does not mean "business," we are perplexed as to how parties to similar future contracts can ever ensure that particular uses of property will not occur.  How can such future parties be any more clear or direct than the parties to the present agreement?  Perhaps, the dissent would have them be required to set forth lengthy enumerations of specific businesses to be prohibited.  However, once words are ignored by courts, greater precision by contracting parties in the use of words can only promise a limited degree of certainty as to how such words will be construed by these same courts in the future.

## V. Conclusion

We conclude that the operation of a "family day care home" violates a covenant prohibiting commercial or business uses, and that such a covenant is enforceable. Accordingly, we reverse the decision of the Court of Appeals and remand to the circuit court for entry of an order granting summary disposition in favor of plaintiffs.

CORRIGAN, C.J., and TAYLOR, and YOUNG, JJ., concurred with MARKMAN, J.

JANICE TERRIEN, THOMAS HAGEN, and
JANET THOMAS,

    Plaintiffs-Appellants,

v                              No. 115924

LAUREL ZWIT, TIM ZWIT, KEN CLARK,
and NICCI CLARK,

    Defendants-Appellees.

_____

KELLY, J. (*dissenting*).

    I respectfully disagree with the majority's conclusions. The analysis characterizing the operation of family day-care homes as a commercial use is conclusory, providing an unworkable standard for determining whether future uses are residential or commercial. Additionally, the opinion all but eviscerates the public policy doctrine long recognized in this state's case law.

    I would hold that the family day-care homes involved here are residential in nature and do not violate restrictive covenants prohibiting commercial and business use. I would

hold also that the covenants prohibiting the operation of family day-care homes are contrary to public policy and, therefore, are unenforceable.

## I.  RESTRICTIVE COVENANTS

In determining that a family day-care home is a commercial or business use of real property, the majority places great weight on compensation.  It relies on a single sentence contained in *Lanski v Montealegre*[1] that broadly defines commercial activity as any activity motivated by profit.

However, as evidenced in the majority's discussion of that case, profit was not the determinative factor in concluding that the defendant's nursing home was a commercial activity.  Instead, the Court also considered the effect of the home's activity on the general plan of the area, which was originally intended as a private resort area.  *Id*. at 49-50.

The Court used a similar approach with respect to adult foster homes in *City of Livonia v Dep't of Social Services*, 423 Mich 466; 378 NW2d 402 (1985).  There it held that such homes do not violate restrictive covenants limiting land use to residential purposes and prohibiting noxious or offensive trade, manufacturing, secondhand merchandising, and wrecking businesses.  The mere fact that adults living there made

_____

[1]361 Mich 44; 104 NW2d 772 (1960).

2

payments for certain items and services did not transform residential activities to commercial activities. *Id.* at 529.

These cases illustrate that land use should be characterized according to how the activity involved there affects the general plan of the area. This approach is prevalent in cases involving residential use covenants. See, e.g., *Wood v Blancke*, 304 Mich 283; 8 NW2d 67 (1943); *O'Connor v Resort Custom Bldrs, Inc*, 459 Mich 335; 591 NW2d 216 (1999); *Beverly Island Ass'n v Zinger*, 113 Mich App 322; 317 NW2d 611 (1982). While usual, ordinary, and incidental use of property as a residence does not violate a residential use restriction, unusual and extraordinary use might. The determination focuses on the particular facts of the case. *Wood, supra* at 289. No logical reason has been shown why a similar approach should not be employed in cases involving commercial and business use restrictions.

This approach also honors the intent of the parties by considering use restrictions in their entirety and in light of the particular facts of the case. It produces the proper standard for characterizing property use, not the narrow approach of the majority, which focuses on a single consideration.

Applying that analysis here, no showing has been made that the operation of defendants' family day-care homes had

3

any effect on the overall residential character of their neighborhood. Nor is there any evidence other than compensation that supports a conclusion that the family day-care homes were commercial or business activities. It is important to note that this case was decided on stipulated facts. As a result, the record contains limited information about the operation of the family day-care homes. It includes the parties' stipulations to the deed restrictions, defendants' operation of a family day-care home in their private residences, and the parties' ownership of land within the subdivision. There is no evidence regarding the pedestrian and vehicular traffic associated with the day-care homes or its effect on the subdivision. Thus, it is impossible to conclude from the record that the family day-care homes do not conform to the ordinary and common meaning of "use for residential purposes."

In light of these facts, the restrictive covenants do not compel a ruling for plaintiffs.[2] They address the residential

---

[2]The restrictive covenants are:

1. No part of any of the premises above described may or shall be used for other than private residential purposes.

3. No lot shall be used except for residential purposes.

12. No noxious or offensive activity shall be
(continued...)

4

nature of the neighborhood.  To protect it, they prohibit activity that might become an annoyance to the neighborhood.

The restriction prohibiting commercial and business enterprises echoes the intent to prevent such activity.  It also prohibits the storing of equipment used in a commercial or industrial enterprise, an activity that visibly changes a neighborhood.  It is this visible adverse effect on the residential character of the neighborhood that the restrictions seek to prevent, not a discrete activity such as that involved here.  I would conclude that the restriction prohibiting commercial and business enterprises limits those activities visibly affecting the residential nature of the

---

[2](...continued)
carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.

14.  No part or parcel of the above described premises shall be used for any commercial, industrial, or business enterprises nor the storing of any equipment used in any commercial or industrial enterprise.

23.  If the parties hereto, or any of them, or their heirs, assigns, or successors, as the case may be, shall violate or attempt to violate any of the covenants herein, it shall be lawful for any other person or persons owning any real property situated within the bounds of the above described premises to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant, and either to prevent him or them from doing so, or to recover damages arising or resulting from such violation.

5

neighborhood.

It is apparent from the interpretations of the terms "commercial, industrial, or business enterprises" that have been advanced by this Court that there is considerable disagreement about their meanings. The absence of a definition in the restrictive covenants leaves the ambiguity unresolved and opens the terms to judicial interpretation. See *Craig v Bossenbery*, 134 Mich App 543, 548; 351 NW2d 596 (1984). Restrictive covenants must be reasonably construed. *Boston-Edison Protective Ass'n v Paulist Fathers, Inc*, 306 Mich 253, 257; 10 NW2d 847 (1943).[3] And they are strictly construed against the party seeking to enforce them, all doubts regarding the restrictions being resolved in favor of the free use of property. *City of Livonia, supra* at 525.

Applying these rules of construction, I cannot agree with the majority's conclusion that the restrictive covenants prohibit family day-care homes. The majority's absolute prohibition of all forms of activity generating compensation would preclude activities that normally have no visible effect on a community, such as babysitting services and freelance writing.

---

[3]In *Boston-Edison Protective Ass'n,* this Court refused to interpret the terms "single dwelling house" as requiring use limited to those who are members of a single family.

6

The effect of the activity is relevant where the meaning of the restrictive covenants and the question of breach is uncertain. See *Oosterhouse v Brummel*, 343 Mich 283, 289; 72 NW2d 6 (1995). When considered in the context of the other restrictions, it is unlikely that the majority's broad interpretation of the covenants is what was intended. Accordingly, the effect on the neighborhood is relevant to a decision whether the operation of a family day-care home violates a covenant prohibiting commercial or business use. The majority's is an extreme construction and one that unnecessarily constrains the use of residential property.

Therefore, I would hold that the defendants' family day-care homes do not violate the restrictive covenants prohibiting commercial or business uses.

## II. PUBLIC POLICY

Even if the operation of family day-care homes were violative of plaintiffs' restrictive covenants, the covenants are contrary to public policy and cannot be enforced. Public policy was defined by this Court in *Skutt v Grand Rapids*[4] and *Sipes v McGhee*, 316 Mich 614, 623-624; 25 NW2d 638 (1947):[5]

> "'What is the meaning of "public policy?" A correct definition, at once concise and

---

[4]275 Mich 258, 264-265; 266 NW 344 (1936).

[5]Rev'd on other grounds in *Shelley v Kraemer*, 334 US 1; 68 S Ct 836; 92 L Ed 1161 (1948).

comprehensive, of the words "public policy," has not yet been formulated by our courts.  Indeed, the term is as difficult to define with accuracy as the word "fraud" or the term "public welfare."  In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like.  It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

"'Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision.  More often, however, it abides only in the customs and conventions of the people,—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man.  It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic.  When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court.  It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these.  The obvious fallacy of such a conclusion is quite apparent from the most superficial examination.  When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy.  When a contract is contrary to statute, we say it is prohibited by a statute, not by public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its

8

depth, greater than any or all of them.  If this be not true, whence came the first judicial decision on matter of public policy?  There was no precedent for it, else it would not have been the first.'" [*Skutt, supra* at 264, quoting *Pittsburgh, C C & St L R Co v Kinney*, 95 Ohio St 64; 115 NE 505 (1916).]

Public policy is what is just, right, reasonable, and equitable for society as a whole.  McNeal, *Judicially determined public policy:  Is "the unruly horse" loose in Michigan?*, 13 TM Cooley L R 143, 149 (1996).

Contrary to the majority's conclusion, the public policy of this state supports family day-care homes.  This fact is evidenced by the actions over time of various state entities. The Legislature has defined family day-care homes as residential uses in zoning statutes.  See MCL 125.216g and 125.286g.[6]  It has seen fit to regulate family day-care homes in the context of the child care licensing act for the protection of children.  See MCL 722.111 *et seq.*[7]

The executive branch has addressed the issue of child care.  Michigan Executive Order No. 1995-21 established an advisory committee on day care for children.  The committee later issued recommendations intended to strengthen the child

---

[6]Earlier cases examined zoning statutes in determining public policy.  See *Craig, supra*; *McMillan v Iserman,* 120 Mich App 785; 327 NW2d 559 (1982).  We know of no reason to discard this approach.

[7]This reliance is supported by reasoning in *Craig, supra*. That case relied in part on the Adult Foster Care Facility Licensing Act in determining public policy.

9

care system of this state.  See DSS *Child Care:  Making It Work*, Pub No 714 (February, 1996).

Finally, the judiciary in case law has proclaimed that Michigan public policy favors family day-care homes.  For example, in *Beverly Island, supra* at 330-331, the Court of Appeals articulated that policy.

In light of these express indications, it follows that restrictive covenants prohibiting family day-care homes are contrary to our state's public policy and are unenforceable.[8] The majority's dismissal of these strong indications of public policy is baffling and disturbing.  Its narrow approach to determining public policy constrains the judiciary by prohibiting it from invalidating covenants absent express statutory mandates.

But judicial decisions are an important component of public policy because they fill gaps occurring in constitutions and statutes.  Constitutions, which are necessarily broad in scope, are not intended to resolve every controversy that might arise.  Statutes are narrower in scope, providing rules governing society.  But it is clear that the

---

[8]We acknowledge that *Wood* supports property owners' contractual rights to enforce restrictive covenants. However, such restrictions cannot be enforced when they violate sound public policy.  *Livonia, supra* at 525; *Oosterhouse, supra* at 286.  Thus, the contractual rights of property owners cannot contravene  public policy.

Legislature cannot foresee every situation likely to result in controversy.  McNeal, *supra* at 143-144.

When controversy arises, it is the role of the judiciary to determine the law as it applies to the facts of the particular case.  This sometimes requires the judiciary to make public policy determinations.  Thus, if the courts are to decide issues presented in novel factual situations not contemplated by statute, they must necessarily have the power to determine existing public policy.  *Id*. at 146.

As early as 1888, this Court acknowledged the significance of public policy.  See *McNamara v Gargett*, 68 Mich 454; 36 NW 218 (1888).  *McNamara* adopted a definition of public policy that considered the morals of the time and the established interest of society.  *Id*. at 460.  It held that a promissory note was not enforceable, reasoning that the interests of the individual must be subservient to public welfare.  *Id*. at 461-462.  Public policy was also considered by this Court in decisions as old as *Fetters v Wittmer Oil & Gas Properties*,[9] *Brown v Union Banking Co*,[10] and *Sellars v Lamb*.[11]

---

[9]258 Mich 310; 242 NW 301 (1932).

[10]274 Mich 499; 265 NW 447 (1936).

[11]303 Mich 604; 6 NW2d 911 (1942).

Hence, the majority's refusal to weigh, as is appropriate here, public policy not codified in the law of the state is sharply contrary to this Court's long established practice. The majority fails to provide a persuasive reason for so doing. Instead, it engrafts its own version of what the law should be, discarding the knowledge and wisdom of those who came before the current Court. This is the embodiment of judge-made law.

### III. CONCLUSION

The majority's reasoning contravenes established principles of law. It unreasonably characterizes land use employing only one criterion, whether monetary compensation is involved, without any consideration of the restrictions as a whole or the effect of the use on the community. This creates an unworkable standard with far-reaching negative implications regarding the free use of land.

Additionally, the majority turns its back on public policy that was developed and has been applied by this Court for decades. This too has extensive adverse implications for the jurisprudence of the state.

The operation of family day-care homes is residential in nature and does not violate restrictive covenants prohibiting commercial or business use. Additionally, restrictive covenants barring their operation are contrary to public

12

policy and, therefore, are unenforceable.  I would affirm the Court of Appeals decision.

CAVANAGH, J., concurred with KELLY, J.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

JANICE TERRIEN, THOMAS HAGEN and
JANET THOMAS,

     Plaintiffs-Appellants,

v                                      No. 115924

LAUREL ZWIT, TIM ZWIT, KEN CLARK,
and NICCI CLARK,

     Defendants-Appellees.

_____

WEAVER, J. (*dissenting*).

    I respectfully dissent from the majority opinion.  I would hold that family day-care homes are not inherently incompatible with the restrictive covenants in this case, and, on the basis of the facts to which the parties have stipulated, affirm the grant of summary disposition in favor of defendants.

    The issue in this case is whether the restrictive covenants that are recorded for the defendants' properties prohibit the defendants from operating licensed family day-

care homes[1] at their residences

Restrictive covenants in deeds will be construed strictly against the grantors and those claiming the right to enforce them. All doubts will be resolved in favor of the free use of property. *James v Irvine,* 141 Mich 376, 380; 104 NW 631 (1905). Deed restrictions are property rights. The courts will protect those rights if they are of value to the property owner asserting them and if the owner is not estopped from seeking enforcement. *Rofe v Robinson,* 415 Mich 345, 349; 329 NW2d 704 (1982).

The restrictions in this case provide, in pertinent part:

1. No part of any of the premises above described may or shall be used for other than private residential purposes.

* * *

3. No lot shall be used except for residential purposes.

* * *

12. No noxious or offensive activity shall be

---

[1]MCL 722.111(f)(iii) provides:

"Family day care home" means a private home in which 1 but fewer than 7 minor children are received for care and supervision for periods of less than 24 hours a day, unattended by a parent or legal guardian, except children related to an adult member of the family by blood, marriage, or adoption. Family day care home includes a home that gives care to an unrelated minor child for more than 4 weeks during a calendar year.

2

carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.

* * *

14. No part or parcel of the above described premises shall be used for any commercial, industrial, or business enterprises nor the storing of any equipment used in any commercial or industrial enterprise.

The majority narrowly focuses on restriction 14 and holds that any activity that creates a profit is prohibited by the restrictive covenant. I disagree with the majority's analysis, because it fails to consider the covenant as a whole and the neighborhood to which it applies. See *Lanski v Montealegre,* 361 Mich 44; 104 NW2d 772 (1960). The majority conclusion would prohibit a stockbroker from working from home on his computer, an author from writing at his home office, an attorney from writing on billable time at home, or even a neighborhood child from mowing his family's and the neighbors' lawns for pay. I do not believe that this was the intent of the parties when they entered into the covenant.[2]

_____

[2]The majority asserts that "where agreements that have been freely reached prove flawed, they can be undone or modified through the same process." Slip op, p 30. It is indeed the case that if all the interested parties-in this case the entire subdivision-agree to modify or revoke the covenant, that could be done. See 21 CJS, Covenants, § 33, pp 322-323. Nevertheless, it is not relevant to the key issue, determining whether the defendants' family day-care homes are
(continued...)

3

This Court should consider more than whether the activity is designed to produce a profit.  As this Court has previously said:

> [T]he rights of the parties are not to be determined by a literal interpretation of the restriction.  It is to be construed in connection with the surrounding circumstances, which the parties are supposed to have had in mind at the time they made it, the location and character of the entire tract of land, the purpose of the restriction, whether it was for the sole benefit of the grantor or for the benefit of the grantee and subsequent purchasers, and whether it was in pursuance of a general building plan for the development and improvement of the property. [*Brown v Hojnacki*, 270 Mich 557, 560-561; 259 NW 152 (1935) (citations omitted).]

Thus, the Court should consider other factors, such as the purpose of the restriction and the effect on the neighborhood, in determining whether the disputed activities violated the restrictive covenant at issue.  See *Lanski v Montealegre, supra.*[3]  In determining the effect on the

---

[2](...continued)
prohibited by the restrictive covenant at issue here.

[3]In *Lanski v Montealegre* the Court considered a covenant providing that owners "shall not use said premises for any commercial enterprise or engage in any commercial undertaking thereon . . . ."  *Id*. at 46.  Defendants established a convalescent home in a building formerly used as a residence. The Court said that the general plan for a private resort area indicated that a broad definition of "commerce" was intended. "In its broad sense commercial activity includes any type of business or activity which is carried on for a profit."  *Id*.
(continued...)

4

neighborhood, the court should consider whether the covenant applies only to one individual tract of land, or to an entire neighborhood or subdivision.  It is also necessary to consider the character of the surrounding neighborhood—for example, whether it is a private resort area, a single-family neighborhood, a neighborhood containing one or more apartment houses, or a mixed-use neighborhood.

Here the covenant was designed to preserve the residential nature of the subdivision and to avoid the disruption to the neighborhood that "commercial, industrial, or business enterprises" would cause.  Family day-care homes, absent some special feature such as signs or intrusive lighting, do not cause such a disruption.  Family day-care homes are limited to seven or fewer children, which limits the effect on neighborhoods.  MCL 722.111(f)(iii).  Their essential characteristics are compatible with a residential neighborhood, and they do not necessarily have any more effect on a neighborhood than any large family.  Further, the Legislature has concluded that family day-care homes within neighborhoods are favored, as evidenced by the county zoning

---

[3](...continued)
at 49.  Nevertheless, the Court went on to examine the effect of the home on the neighborhood: "The patients, the visitors, the nurses, and the over-all atmosphere detract from the general plan of the private, noncommercial resort area originally intended." *Id*. at 49-50.

act and the township zoning act.[4]  The majority fails to give this point sufficient consideration.

I conclude that operating a family day-care home does not inherently affect the residential character of the neighborhood that the covenant was designed to protect.  This case was submitted on stipulated facts, and there is no indication of signs, lights, or other effects on the

---

[4]In both zoning acts, it is specified that family day-care homes *shall* be considered a residential use of property, and a permitted use in all residential zones.

MCL 125.216g(2) of the county zoning act provides:

> A family day-care home licensed or registered under Act No. 116 of the Public Acts of 1973, being sections 722.111 to 722.128 of the Michigan Compiled Laws, shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

MCL 125.286g(2) of the township zoning act provides:

> A family day-care home licensed or registered under Act No. 116 of the Public Acts of 1973, being sections 722.111 to 722.128 of the Michigan Compiled Laws, shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

6

neighborhood that would cause the family day-care homes to be in violation of the restrictive covenant.  Accordingly, I would affirm the grant of summary disposition in favor of the defendants.