*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

**S T A T E   O F   M I C H I G A N**

**C O U R T   O F   A P P E A L S**

---

*In re* E. EARL LYDEN TRUST.

---

DENICE LYDEN,

       Appellant,

v

HUNTER LYDEN, Trustee of the E. EARL LYDEN
TRUST,

       Appellee,

and

CHRISTOPHER PIEDMONT,

       Other Party.

FOR PUBLICATION
April 4, 2024

No. 362112
Muskegon Probate Court
LC No. 20-002025-TV

---

Before: M. J. KELLY, P.J., and MARKEY and CAMERON, JJ.

MARKEY, J. (*concurring in part, dissenting in part*).

I agree with the majority that any claims for equitable relief based on breach of fiduciary duty and fraud on marital assets fail as a matter of law. But I also conclude that equitable relief is available on the basis of a violation of public policy. Accordingly, I respectfully concur in part and dissent in part.

# I. OVERVIEW

Appellant, Denice Lyden, appeals by delayed leave granted[1] the probate court's order granting summary disposition under MCR 2.116(C)(10) in favor of appellee, Hunter Lyden, as Trustee of the E. Earl Lyden Trust (the Trust), with respect to Denice's claims seeking reformation of the revocable, *inter vivos* Trust, imposition of a constructive trust, and invalidation of the Trust on public policy grounds. Earl, who passed away before the instant litigation was commenced, was Hunter's father and Denice's husband.[2] This case concerns a probate petition filed by Denice that contained eight counts, all of which pertained in one way or another to an amendment and restatement of the Trust executed by Earl in 2020 that disinherited Denice after he had earlier signed a 2018 amendment and restatement of the Trust that would have provided Denice with lifetime income generated by the Trust's assets upon Earl's death. The crux of Denice's position below was that in exchange for being designated the recipient or beneficiary of lifetime income under the 2018 amendment and restatement of the Trust, she had consented to the relinquishment of her surviving-spouse interest in two of Earl's retirement plans so that he could name the Trust as the beneficiary of those plans. Earl, however, reneged in 2020 by altering the Trust to Denice's detriment.

The bulk of the "marital assets" were earned by Earl and held by Earl personally or his Trust, and the Trust, if not already holding these assets, was the destined repository on Earl's death, either as a named beneficiary on certain accounts or by pour-over designation in Earl's will. Earl removed Denice as a Trust beneficiary during the couple's divorce proceedings and shortly before Earl died of cancer. Earl had acknowledged that the couple's assets, for the most part, were "marital" and subject to division in the divorce action, which was still pending when Earl died but then dismissed in light of his death. Denice was recognized as the surviving spouse, receiving her elective share and some jointly-held assets that paled in comparison to the value of the Trust's corpus—and the income that it will generate—that will ultimately all pass to Hunter as the lone beneficiary under the 2020 version of the Trust.

On appeal, Denice's argument, as limited by the order granting leave, is that Earl's conduct in 2020 in disinheriting her constituted breach of a fiduciary duty owed to Denice and fraud on marital assets, both justifying equitable relief in the form of reformation or the imposition of a constructive trust. The fraud-on-marital-assets claim or theory also serves as the primary basis for Denice's stance that Earl's conduct violated public policy.[3] On the authority of MCL 700.7404 and MCL 700.7410(1), I would hold that the Trust Earl executed during the divorce proceedings terminated or was rendered void at the time of his death because the purpose of the Trust had become contrary to public policy to the extent that the Trust held, was the beneficiary of, or otherwise pertained to "marital assets" that would have otherwise been equitably divided in the

---

[1] *In re E Earl Lyden Trust*, unpublished order of the Court of Appeals, entered March 7, 2023 (Docket No. 362112).

[2] Hunter was Earl's son from a prior marriage.

[3] I note that Denice's attempt to appeal the dismissal of counts tied to her effort to enforce the alleged 2018 agreement concerning lifetime income generated by the Trust was ultimately unsuccessful for the reasons discussed later in my opinion.

divorce proceedings had Earl survived until entry of judgment.  I reach this conclusion regardless of whether Earl had an intent to defraud Denice.

## II.  BACKGROUND

### A.  UNDERLYING FACTS

The facts in this case are largely not in dispute; rather, the focus of the appellate arguments is on the application of the law to the factual circumstances presented to the probate court.  In part, Denice urges us to consider recognition of a claim entailing fraud on marital assets accomplished through estate planning maneuvers like those that transpired in this litigation.  I note that the procedural history of the case was extensive, encompassing multiple petitions and motions, including several motions for summary disposition.

Denice and Earl married in February of 1998.  It was Earl's fourth marriage and Denice's second.  Denice and Earl had children from prior relationships, but their union did not produce any children.  Earl, a certified public accountant and a graduate of Ferris State University, spent his career in the investment and securities industry.  His employment produced a substantial income.  Denice averred that Earl earned between $150,000 and $300,000 annually during the course of the marriage.  Denice held a certificate as a dental hygienist, and she worked as a bookkeeper and accounts-payable representative for a number of small, family-owned companies.  Denice never earned more than $20 per hour.  The couple resided in a number of locations throughout the country during their marriage, culminating with a residence in St. Louis, Missouri.  They also maintained a vacation condominium in Muskegon, Michigan.  According to Denice, except for a joint bank account from which the couple withdrew funds to pay certain expenses, Earl controlled all of their finances.[4]

Throughout the couple's marriage, they accumulated assets that were titled in either Earl's name, Denice's name, both their names jointly, or in the name of the Trust.  Earl maintained considerable investments with Wells Fargo Advisors, and these securities were all titled in either Earl's or the Trust's name.  Earl also had substantial retirement plans in his name, consisting of an IRA, a Wells Fargo 401(k) plan, and a PNC pension plan.  Denice did not contribute financially to any of Earl's retirement accounts.  Earl's securities amounted to approximately $500,000 in value, and his retirement accounts totaled about $1.3 million in value, around $900,000 of which was in the 401(k) plan.[5]  The equity held by Denice and Earl in the St. Louis home, a jointly-owned condominium, amounted to approximately $329,000, and the equity in the Muskegon

---

[4] The joint bank account had a balance of just under $4,000 during the middle of the divorce proceedings in early 2020.  At that time, Earl had a health savings account with a balance of $60,564; Denice had a health savings account with a balance of $725; Earl had a checking account with a balance of $1,534; and Denice had a checking account with a balance of $2,853.  The other values noted in this opinion are likewise assertions of value in early 2020 when the divorce case was pending.

[5] Denice had her own IRA and 401(k) plan, which together had a total value of approximately $56,000.

-3-

condominium, which was titled in Earl's name and later transferred to the Trust, totaled about $125,000. They had two jointly-owned motor vehicles, one worth $8,000 and the other $14,000. Earl also had a $10,000 dock or boat slip, a $70,000 boat, and a $75,000 airplane. Earl did claim in the divorce action that some of the value of the St. Louis home, $35,000, and some of the value of his IRA, $75,000, was his separate property.

On May 10, 2001, Earl created the Trust, which was a revocable, *inter vivos* trust. Earl, as the lone settlor, named himself as the sole trustee. He designated Denice and Hunter as the Trust's beneficiaries upon his death. And Earl named his brother and Denice as co-successor trustees. Under the terms of the Trust as it originally existed in 2001, upon Earl's death, the successor trustees were to establish two trusts, one benefiting Denice and the other benefiting Hunter. Given the limited extent of assets in her own name, Denice never created her own trust, but she did execute several wills during the marriage.

Earl amended the Trust in 2010 to designate Denice as the sole successor trustee and to add Denice's daughter as an additional beneficiary. In August of 2018, while the couple were staying at their Muskegon condominium, Earl retained attorney David Waterstradt to make changes to the couple's estate plans. Earl sought to amend the Trust and his will, obtain a new will for Denice, and to have financial and medical powers of attorneys drafted for both he and Denice. The couple met with Waterstradt on August 27, 2018. Earl expressed a desire to name the Trust as the beneficiary of his Wells Fargo 401(k) plan and his PNC pension plan. Denice had an existing survivorship interest in the accounts. Waterstradt advised the couple that Earl could not designate the Trust as a beneficiary of those retirement plans unless Denice waived her survivorship rights in the accounts and consented to the relinquishment of her interests.

Denice claimed that she felt compelled to consent and only did so in return for Earl's promise to designate Denice as the beneficiary of all Trust income for her lifetime upon Earl's death. In an affidavit, Denice averred as follows:

> As part of his 2018 Estate Plan, Earl offered and promised me that he would name his Trust the beneficiary of the Retirement Accounts and designate me as the income beneficiary of all Trust assets for my lifetime . . . in return for me signing the waivers . . . .

When asked during his deposition what Earl and Denice had asked him to do in 2018, Waterstradt testified, "Denise [sic] wanted her assets to go to her children and Earl wanted his assets to provide a lifetime income to Denise [sic], and then, to go to his son Hunter." Denice testified in her deposition about the nature of the discussions with Waterstradt:

> I recall that we discussed that . . . when [Earl] retired, everything would be going into his trust, everything would be – the trust would be the beneficiary . . . of everything, and that I would not have access to any of the principal of the trust. I was only a beneficiary of the income that would be generated from the trust.

Waterstradt's notes indicated that the Trust was to be named the lone beneficiary of the retirement accounts and that Denice was to receive all the income generated by the Trust's assets, including required minimum distributions.

-4-

On October 23, 2018, Earl and Denice signed their updated estate planning documents, including Earl's execution of the amended and restated Trust, which, for ease of reference, I shall refer to as the 2018 Trust. The 2018 Trust designated Denice as the beneficiary of all the income generated by the Trust for her lifetime upon Earl's death, with the Trust's principal to generally pass to Hunter. Denice remained the sole successor trustee, and the trustee was authorized to "distribute up to three percent (3%) of the trust principal to [Denice] if necessary to provide for [her] health care."[6] Upon Denice's remarriage or death, her interest in the 2018 Trust would terminate, except that should she remarry, a $200,000 payout to Denice was mandated. Initially, the 2018 Trust was not going to provide Denice with any payment if she remarried; however, she requested that the language providing for the $200,000 payment be included. But I do note that the 2018 Trust additionally indicated that should the couple divorce, Denice was to be treated as predeceasing Earl. Finally, the 2018 Trust contained the following provision governing amendment and revocation:

> During the Settlor's lifetime, this Agreement may be revoked partially or completely or amended in any respect. This power may be exercised by Settlor at any time and without the consent of Trustee or anyone else, but the revocation or amendment must be in writing. No amendment, however, may increase the duties or responsibilities of Trustee without Trustee's written consent.

On November 7, 2018, Denice signed consents that relinquished her spousal-survivorship interests or rights with respect to the two retirement plans. And that same day, Earl formally designated the 2018 Trust as the beneficiary of the Wells Fargo 401(k) plan and his PNC pension plan.

Not quite one year later, Denice filed for divorce in St. Louis County, Missouri, on November 5, 2019. On November 6, 2019, the family court in St. Louis County that was assigned the case issued a standard order for divorce litigation, which the parties refer to as the "status quo order," and which provided in relevant part that

> neither party shall . . . dissipate, sell, remove, assign, transfer, dispose of, lend, mortgage, or encumber any property of a party, real or personal, except in the ordinary course of business or for the necessary expenses of the parties' family under the circumstances unless ordered by the Court or unless consented to in writing by both parties.

On January 28, 2020, Earl filed a "statement of property" in the divorce proceedings, wherein he identified as "marital" assets almost all of the property alluded to above, including, for the most part, Earl's retirement accounts and securities, even those currently held by the Trust. The total value of the marital property was set at approximately $2.6 million.

In February of 2020, Earl once again contacted and retained attorney Waterstradt to amend and restate the terms of the 2018 Trust. Earl advised Waterstradt that Denice had filed for divorce and that, to the extent possible, he wanted to remove Denice as a beneficiary under the Trust and

---

[6] Denice had requested the inclusion of this medical-based provision that allowed for a minimal invasion of the 2018 Trust's principal.

designate Hunter as the Trust's sole beneficiary and successor trustee. When Earl inquired whether he could legally make such changes during the pendency of the divorce litigation, Waterstradt advised Earl by e-mail as follows on February 27, 2020:

> Well, under Michigan law, a spouse only has rights to your probate estate. By using a trust (and making sure your assets are actually titled in the trust or payable to the trust), you can effectively disinherit a spouse. But remember, this only applies to what happens if you die. This has no effect whatsoever on the divorce proceeding. That will be resolved under equitable principles, which typically will result in her getting something in the divorce settlement.[7]

Earl responded, "I plan to live for a long time . . . my question was what if. Thank you again and I hope to reply with executed documents tomorrow." (Ellipsis in original.)

On February 28, 2020, Earl signed an amendment and restatement of Trust, which I shall refer to as the 2020 Trust. The 2020 Trust designated Hunter as the sole beneficiary and successor trustee. Additionally, the 2020 Trust expressly stated that "a divorce proceeding is pending and [Earl] therefore[] intentionally makes no provision for [Denice] in this Agreement."

In March 2020, Earl was hospitalized, and he informed Denice that he had stage IV lung cancer, which, according to Denice, was the first time that she heard of Earl's illness. Denice testified that Earl also told her that he had recently altered the 2018 Trust, making Hunter the sole beneficiary and successor trustee.[8] Denice further testified that she informed her divorce attorney about the 2020 Trust and her disinheritance. After Earl's hospitalization ended in early April 2020, he told Denice that a doctor had explained to him that his cancer was terminal.[9] Earl then moved into the Muskegon condominium and never returned to Missouri. Denice remained in Missouri.

The divorce action continued in Missouri, and Earl, through counsel, proposed a near-equal division of the marital assets that he had previously identified in his "statement of property." Again, this included assets held by Earl personally and his 2020 Trust, along with property

---

[7] In the underlying e-mail from Earl to Waterstradt, which Denice characterizes as the "smoking gun" e-mail, Earl stated:

> One question, it does not seem fair/logical that I could amend my trust during divorce proceedings cutting her out of everything other than the St. Louis condo. Is this acceptable with the law or will I be somehow exposing myself to personal / legal criticism?

[8] Denice testified as follows regarding her exchange with Earl after being told that Hunter was now the sole beneficiary: "I said, you're not allowed to do that. He says, there's not a Judge in the world that would let me get by with that, or let that stand."

[9] Denice asserts in her brief on appeal that in late 2019 or early 2020, "doctors diagnosed Earl with stage four lung cancer and gave him only months to live." Denice, however, provides no citation to the record in support of her claim that such a diagnosis was made in late 2019.

designated to pass to the 2020 Trust upon his death and then to Hunter. Earl was prepared to divide the vast majority of his securities and retirement accounts. The couple were on the verge of settling—with the only sticking point being that Denice wanted to be designated the beneficiary of Earl's life insurance policy in lieu of spousal maintenance given Earl's diagnosis. By letter dated May 15, 2020, a Hospice doctor declared that Earl was terminally ill, that he was physically incapacitated, and that he was "unable to transact his own affairs." On that same date, an individual operating as Earl's attorney-in-fact under a durable power of attorney conveyed the Muskegon condominium to the Trust.[10] On May 26, 2020, the attorney-in-fact assigned and transferred Earl's interest in an aircraft limited liability company to the Trust.[11] On June 3, 2020, Earl died. In light of his death, the divorce action was dismissed by the Missouri family court, and Denice was dubbed the surviving spouse.

Denice received $69,000 from Earl's probate estate as her elective share as surviving spouse. Denice also sold the home in Missouri, pocketing approximately $300,000. She additionally received one auto valued at $14,000, sold the other vehicle for $8,000, and obtained sole ownership of the joint bank account with a current balance of $1,500. Again, the total value of the marital assets amounted to approximately $2.6 million; therefore, the bulk of the "marital" estate will flow to Hunter as the sole beneficiary under the 2020 Trust.

## B. PROCEDURAL HISTORY

On August 31, 2020, Denice filed a petition in the probate court for an order to maintain the status quo, extend the spousal election deadline, and to provide for supervision of the trust. On September 17, 2020, a stipulated order was entered allowing Hunter to utilize the Trust to cover costs, expenses, and liabilities in relation to the litigation but prohibiting him from otherwise disposing of Trust assets.

On November 2, 2020, Denice filed an eight-count petition to set aside the 2020 Trust and for other relief. In Count I, Denice sought to set aside the 2020 Trust, as well as Earl's associated 2020 will,[12] on the ground that the documents violated the status quo order entered by the Missouri family court. In Count II, Denice alleged that the 2020 Trust constituted a breach of the couple's 2018 agreement by which Denice received a right and interest in the income generated by the Trust during her lifetime in exchange for her waiver of her survivorship or beneficiary rights under Earl's retirement plans. In Count III, Denice contended that the 2020 Trust was contrary to public policy for purposes of MCL 700.7404 and MCL 700.7105(1) because the 2020 Trust disinherited Denice and caused the near total divestment of marital property. In Count IV, Denice maintained that under the doctrine of promissory estoppel, she was entitled to the benefits of her 2018 bargain that she struck with Earl. In Count V, Denice alleged that, assuming the unenforceability of the 2018 Trust, her consent to a change in the beneficiary under Earl's retirement plans was not knowingly made because she mistakenly believed that her consent would essentially render her rights to

---

[10] At this point, Hunter was acting as trustee given Earl's incapacity.

[11] Hunter acknowledges that after his father became incapacitated, the durable power of attorney was utilized to transfer the Muskegon condominium, the airplane, and the boat to the Trust.

[12] The will was essentially a pour-over will, funneling assets, for the most part, into the Trust.

lifetime income under the 2018 Trust irrevocable. In Count VI, Denice claimed that the 2020 Trust unjustly enriched Hunter and the Trust. In Count VII, Denice argued that she was entitled to the creation of a constructive trust in her favor to serve the demands of equity in light of the circumstances in which there was a large marital estate that had been accumulated during a lengthy marriage yet the assets were not fairly shared with Denice. Finally, in Count VIII, Denice alleged that the 2020 Trust should be reformed under MCL 700.7415 so as to implement Earl's 2018 intent to provide Denice with income generated by the Trust's assets during her lifetime upon Earl's death. For purposes of this appeal, the only claims that are at issue are Counts III, VII, and VIII, but it remains important to understand the disposition of all the claims because there necessarily existed, to some extent, an interrelationship between the claims.

On December 3, 2020, Hunter filed a motion for partial summary disposition under MCR 2.116(C)(10). He argued as follows:

> MCL 700.2514 requires a contract to make a will or devise to be in writing. Under Michigan case law, this statute also applies to trusts. Here, [Denice] has admitted that there [was] no written agreement between her and [Earl regarding the retirement plan waivers]. Accordingly, as a matter of law, any alleged oral agreement to make devises to Denice after [Earl's] death may not be enforced, and the Court should grant partial summary disposition as to this aspect of Denice's Petition.

Hunter maintained that if the probate court agreed with this argument, it was required to summarily dismiss Counts II (breach of contract) and IV (promissory estoppel) in their entirety and to dismiss Counts I (violation of status quo order), VI (unjust enrichment), and VIII (reformation of Trust) to the extent that they were based on the alleged 2018 parol agreement. At the hearing on the motion, the probate court acknowledged that there was extrinsic evidence demonstrating that an agreement had been reached between Earl and Denice in which Denice consented to the relinquishment of her spousal survivorship rights under Earl's retirement plans and Earl had agreed to provide Denice with the security of lifetime income produced by the Trust upon his death. The court determined, however, that MCL 700.2514[13] required a writing evidencing the contract or agreement and none existed. Accordingly, the probate court granted Hunter's motion for partial summary disposition. On February 16, 2021, the court entered an order summarily dismissing Counts II and IV in their

---

[13] MCL 700.2514 provides, in relevant part:

> (1) If executed after July 1, 1979, a contract to make a will or devise, not to revoke a will or devise, or to die intestate may be established only by 1 or more of the following:

> (a) Provisions of a will stating material provisions of the contract.

> (b) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract.

> (c) A writing signed by the decedent evidencing the contract.

-8-

entirety, along with dismissing Counts I, VI, and VIII, but only to the extent that they were based on the alleged 2018 agreement.

On February 23, 2021, Hunter moved for partial summary disposition with regard to Count I (violation of status quo order) under MCR 2.116(C)(4), (7), and (10). And on March 8, 2021, Denice filed her own motion for partial summary disposition as to Counts V (2018 consent not given knowingly) and VI (unjust enrichment), requesting that the probate court invalidate the consent to change the beneficiary of the retirement plans to the Trust. On March 22, 2021, Hunter filed another motion for partial summary disposition, claiming that he or the Trust, and not Denice, was entitled to dismissal of Counts V and VI. With respect to Count V, Hunter contended that under the Employee Retirement Income Security Act of 1974 (ERISA), 29 USC 1001 *et seq.*, it is unnecessary to provide legal consideration to a plan participant's spouse for his or her consent to the plan participant's designation of a beneficiary other than the spouse. Hunter further argued that Denice was bound by her written waivers or consents regardless of her subjective intentions when she signed the documents. In regard to Count VI, Hunter contended that there was no genuine issue of material fact that Hunter did not receive a benefit from Denice and that it would not be unjust to permit Hunter to retain death benefits under the ERISA retirement plans via the 2020 Trust. Hunter also asserted that the doctrine of unjust enrichment does not apply when a transaction is subject to an express contract.

At a hearing on April 6, 2021, the probate court ruled in favor of Hunter relative to Counts I, V, and VI, granting him summary disposition on all three claims. With respect to Count V and Denice's claim that her 2018 waivers were not knowingly made, the court first noted that Denice had executed consents to her removal as beneficiary under Earl's retirement plans, not waivers, and that the court had earlier ruled that the alleged 2018 agreement between Denice and Earl was unenforceable. The probate court concluded that the change in beneficiaries did not need consideration under ERISA; therefore, Denice was not entitled to reinstatement as the beneficiary under the retirement plans. With regard to Count VI and Denice's claim of unjust enrichment, the probate court did not explain why it ruled in favor of Hunter. Finally, the probate court addressed Count I and the alleged violation of the Missouri status quo order. The court ruled that the order was not violated by Earl's actions in disinheriting Denice in the 2020 Trust and naming Hunter as the sole beneficiary. The probate court first explained that Denice did not have any ownership interest in Trust property during Earl's lifetime. The court further reasoned that the devises under the 2020 Trust were testamentary and would only take effect upon Earl's death; accordingly, there was no "present transfer[] of asset ownership." The probate court additionally posited that Earl's beneficiary designations remained revocable before his death, that he had the authority to change beneficiaries at any time, and that in Michigan, a trust settlor retains the right to change beneficiaries and disinherit a spouse even during divorce proceedings. On April 29, 2021, the probate court entered an order denying Denice's motion for summary disposition on Counts V and VI, granting summary disposition to Hunter on those two counts, and granting summary disposition in favor of Hunter on Count I of Denice's petition.

Back on March 29, 2021, Hunter had filed yet another motion for partial summary disposition, arguing this time that Count III of Denice's petition regarding alleged public policy

violations should be dismissed.[14]   According to Hunter, the Trust was entitled to summary disposition because Michigan public policy allows a spouse to be disinherited under the other spouse's trust.  Denice responded that Earl owed her a fiduciary duty to protect her interest in the marital assets held by or connected to the Trust.  Denice contended that a fiduciary duty arose because she placed her faith, confidence, trust, and reliance in Earl in regard to his handling of the couple's finances.  Hunter countered that under Michigan law a spouse does not owe the other spouse fiduciary duties during divorce proceedings.  Hunter thus argued that Earl did not owe any fiduciary duty to Denice; rather, Earl, as the sole trustee, only owed duties to himself as settlor under the Trust.

Before Hunter's summary disposition motion on Count III was heard, he moved for summary disposition on April 28, 2021, with respect to Counts VII (constructive trust) and VIII (reformation).  Hunter argued that Denice's request for the imposition of a constructive trust failed because he did not acquire Earl's estate or the Trust's assets by improper means.  Moreover, because the probate court had already granted summary disposition in Hunter's favor on Denice's unjust enrichment claim, she could not show that the alternative ground for imposing the constructive trust, i.e., unjust enrichment, existed.  In regard to Denice's claim for reformation of the 2020 Trust, Hunter argued that summary disposition was appropriate because Denice had acknowledged during her deposition that she was unaware of any mistake of fact or law that affected Earl's intent and the terms of the 2020 Trust, as necessary to entitle her to relief under MCL 700.7415.[15]   Consequently, Denice could not establish the existence of a genuine issue of material fact relative to the elements necessary to obtain relief under the statute.

Denice responded that the fiduciary duty owed to her by Earl and his breach of that duty justified the imposition of a constructive trust to protect the couple's marital assets.  She further responded that she was entitled to reformation of the 2020 Trust.  According to Denice, if her income-for-life benefit under the 2018 Trust was intended to be irrevocable, the 2020 Trust needed to be reformed to fulfill that intent.  But if Earl had intended for the benefit to be revocable, then he effectively defrauded Denice into waiving her survivorship or beneficiary rights under the retirement plans, and reformation would be necessary to undo the fraud.

Before the preceding motions were heard by the probate court, on May 3, 2021, Denice filed a motion for reconsideration of the probate court's ruling granting summary disposition in favor of Hunter on Counts I, V, and VI.  By order dated December 14, 2021, the probate court

---

[14] This motion was not heard at the hearing on April 6, 2021.

[15] MCL 700.7415 provides:

> The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.

denied Denice's motion for reconsideration.[16]  The court, consistent with its previous ruling on Count V, determined that it was unnecessary to assess the purpose of Denice's decision to consent to the relinquishment of her surviving-spouse rights under Earl's retirement plans, that ERISA does not require legal consideration for a spouse's consent to be effective, and that the court, therefore, did not need to rule on whether there was any consideration.  The probate court next acknowledged that it had previously failed to explain or make findings in regard to why it ruled against Denice and in favor of Hunter on the unjust enrichment claim in Count VI.  The court now found that there was nothing unjust or inequitable in permitting Hunter to be enriched as the lone beneficiary of the 2020 Trust.  The probate court explained that "Michigan law permitted Earl . . . to exclude his spouse as a beneficiary of his trust and [that] the results from that exclusion cannot be found unjust."  The probate court concluded that there was no palpable error warranting relief.[17]

On December 16, 2021, the probate court finally heard arguments on Hunter's motions for summary disposition relative to Counts III, VII, and VIII of Denice's petition—the counts at issue in this appeal.  With respect to the public policy allegations in Count III, the probate court reasoned and ruled as follows:

> I'm looking at the allegation that the change was contrary to public policy. I don't find that it was against public policy, because it did not interfere with the freedom to marry, or divorce, or limit religious freedoms, or that it was frivolous or capricious.
>
> With regards to whether or not *Soltis* [*v First of America Bank-Muskegon*, 203 Mich App 435; 513 NW2d 148 (1994),] should stand in the light of this case, I do find that we're never going to be 100 percent sure what the motives were for our settlor to make the changes that were made. However, I believe, from what I've heard, that he wanted to protect his assets because Denice was divorcing him. He knew he was dying from stage four terminal lung cancer and he wanted to provide an inheritance for Hunter Lyden, because he knew he wouldn't be around to help him anymore during his life. He was going to be gone. And so he may need more assets than what he originally had planned on giving him, because he wasn't going to be there throughout his life to help him, so I think that is a very valid reason that he could have changed beneficiaries.
>
> Denice did not have a vested right, because Earl had every right to amend his trust at any time during his life. I'm looking for other points here.
>
> With regards to the talk about the divorce in Missouri, it didn't happen. She wasn't awarded any of the marital assets because there is no judgment of divorce. And so as a matter of law, no judgment was entered in that case and this court can't

---

[16] I note that as of December 14, 2021, the probate court had yet to hold a hearing on Hunter's summary disposition motions concerning Counts III, VII, and VIII.

[17] Subsequently, the probate court entered a stipulated order dismissing Denice's motion for reconsideration on Count I that had alleged a violation of the Missouri status quo order.

award her anything from that case or find that she is due any assets from that case because there is no judgment from that case and it's closed. It couldn't be finished because, unfortunately, Mr. Earl Lyden had passed away, and so I don't think that that has any effect on this case.

And I also don't find that further discovery in this matter would change the outcome, because, as a matter of law, again, he had – he had the right to change his beneficiary.

Next, the probate court granted summary disposition in favor of Hunter on Count VII of the petition seeking the imposition of a constructive trust. The court concluded that a constructive trust was inappropriate because (1) Earl had a legal right to title assets in his own or the Trust's name, (2) Earl owed no fiduciary duty to Denice, (3) neither Hunter nor the Trust were unjustly enriched by the 2020 Trust, (4) the Missouri status quo order was not an impediment to the execution of the 2020 Trust, (5) Denice did not have a vested right in the assets or income of the Trust, and (6) Denice knew that the 2018 Trust could be modified by Earl at any time.[18] The probate court also granted summary disposition on Count VIII of the petition seeking reformation of the 2020 Trust after determining that there was no fraud or mistake of fact or law that would justify reformation under MCL 700.7415. The probate court memorialized and implemented its bench rulings on Counts III, VII, and VIII in an order entered on January 24, 2022.[19]

Thereafter, Hunter moved for sanctions under MCL 600.2591, arguing that Denice's eight-count petition to set aside the 2020 Trust was frivolous. On April 22, 2022, the motion was heard and denied by a successor trial judge, resulting in the entry of an associated order on May 2, 2022. On May 13, 2022, Denice filed a claim of appeal in this Court with regard to the litany of orders that had been entered against her throughout the probate proceedings. This Court administratively dismissed the claim of appeal by order entered on May 31, 2022, ruling that it lacked "jurisdiction over the claim of appeal because, although the May 2, 2022 order appealed from [was] appealable by right, MCR 5.801(A)(2)(x), appellant [was] not aggrieved by that order." *In re E Earl Lyden Trust*, unpublished order of the Court of Appeals, entered May 31, 2022 (Docket No. 361401). The order further provided that "assuming without concluding that the other probate court orders filed with the claim of appeal [were] final orders as defined in MCR 5.801(A)(2), claims of appeal from those orders [were] untimely. MCR 7.204(A)(1)(a)." *Id.* The order additionally noted that

---

[18] The probate court noted that it had made some of these same findings in relation to its earlier orders granting summary disposition in favor of Hunter.

[19] Back on April 15, 2021, Denice had filed a petition to set aside an IRA transfer to Hunter, and on April 20, 2021, Hunter moved for summary disposition as to that particular petition. The summary disposition motion was addressed by the probate court at the hearing on December 16, 2021. At the hearing, after the probate court had summarily dismissed Counts III, VII, and VIII of Denice's primary petition in the case, the parties stipulated that the IRA-related petition was now moot and should be dismissed. By order dated January 24, 2022, Denice's petition regarding the IRA transfer to Hunter was dismissed for mootness, but the court allowed it to be resurrected should Denice succeed on appeal with respect to the dismissal of her eight-count petition.

"[i]t is axiomatic that a party cannot wait for a subsequent final order to appeal a prior final order." *Id.*

On July 8, 2022, Denice filed a delayed application for leave to appeal. She raised four separate issues. The first issue challenged the probate court's rulings on Counts VII and VIII regarding, respectively, the constructive-trust and reformation claims that had been summarily dismissed by order dated January 24, 2022. The second issue amounted to a challenge of the probate court's dismissal of Count I concerning the alleged violation of the Missouri status quo order, which was dismissed by order dated April 29, 2021. In the third issue, Denice raised arguments regarding Earl's purported fiduciary duties that formed Denice's public policy claim in Count III of her petition, which had been summarily dismissed by the probate court by an order entered on January 24, 2022. Finally, with respect to the fourth issue, Denice essentially disputed the probate court's decision to dismiss Count VI in which Denice had claimed unjust enrichment. This claim had been dismissed by order dated April 29, 2021. This Court granted Denice's delayed application for leave to appeal in regard to the first and third issues, encompassing the dismissal of Counts III, VII, and VIII. *In re E Earl Lyden Trust*, unpublished order of the Court of Appeals, entered March 7, 2023 (Docket No. 362112). But the panel dismissed the application as to the second and fourth issues covering Counts I and IV for lack of jurisdiction given that the probate court's orders dismissing those claims had been entered more than a year before the delayed application was filed. *Id.* I now proceed to address Denice's appellate arguments that were allowed to go forward.[20]

### III. ANALYSIS

#### A. BROAD OVERVIEW OF DENICE'S APPELLATE ARGUMENTS

Denice presents arguments challenging the summary dismissal of her claims seeking reformation of the 2020 Trust, imposition of a constructive trust, and invalidation of the 2020 Trust on public policy grounds. With respect to all three claims, Denice contends that the probate court erred by granting Hunter's motion for summary disposition because there existed a genuine issue of material fact regarding whether Earl intended to defraud Denice of her interest in "marital assets." In regard to the reformation and constructive-trust claims, Denice additionally maintains that the trial court erred by summarily dismissing the claims because Earl breached a fiduciary duty that he owed to Denice to protect her interest in the marital assets held by Earl and the Trust.

#### B. STANDARD OF REVIEW, SUMMARY DISPOSITION PRINCIPLES, AND STATUTORY AND TRUST CONSTRUCTION

This Court reviews de novo a probate court's ruling on a motion for summary disposition and issues of statutory construction. *In re Casey Estate*, 306 Mich App 252, 256; 856 NW2d 556 (2014). "Whether to recognize a cause of action for breach of fiduciary duty is a question of law

---

[20] This Court denied Denice's motion for an order enjoining waste or dissipation of Trust assets without prejudice to her seeking such relief in the probate court. *In re E Earl Lyden Trust*, unpublished order of the Court of Appeals, entered March 29, 2023 (Docket No. 362112).

-13-

reviewed de novo because the existence of a duty is generally a question of law[.]" *Calhoun Co v Blue Cross Blue Shield Mich*, 297 Mich App 1, 20; 824 NW2d 202 (2012) (citations omitted). We similarly review de novo as a question of law whether to recognize a claim for fraud on marital assets under the circumstances presented in this case. See *id.* Moreover, this Court reviews "de novo a probate court's construction and interpretation of the language used in a will or a trust." *In re Stillwell Trust*, 299 Mich App 289, 294; 829 NW2d 353 (2012).[21]

In *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506-507; 991 NW2d 230 (2022), this Court set forth the guiding principles in analyzing a motion brought pursuant to MCR 2.116(C)(10):

> MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).
>
> A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. Speculation is insufficient to create an issue of fact. A court may only consider substantively admissible evidence actually proffered by

---

[21] "An appeal from the probate court is on the papers filed and a written transcript of the proceedings in the probate court or on a record settled and agreed to by the parties and approved by the court." MCR 5.802(B)(1); see also MCL 600.866(1). In estate proceedings, "[a]ppellate review, including the right to appellate review or interlocutory appeal and provisions as to time, manner, notice, appeal bond, stays, scope of review, record on appeal, briefs, arguments, and the power of the appellate court, is governed by the revised judicature act of 1961 and by supreme court rule." MCL 700.1305.

the parties when ruling on the motion. [Quotation marks, citations, and brackets omitted.]

A court's lone objective when construing the language of a trust is to ascertain and give effect to the settlor's intent. *In re Stillwell Trust*, 299 Mich App at 294. Absent an ambiguity, the words contained in a trust serve as the best indicators when attempting to discern the meaning of the trust and its intended operation. *Id.* The intent of the settlor is gauged from the trust document itself. *In re Kostin Estate*, 278 Mich App 47, 53; 748 NW2d 583 (2008). A trust must be read as a whole, harmonizing its terms with the intent expressed when possible. *In re Brown Estate*, 312 Mich App 684, 694; 880 NW2d 269 (2015). "In sum, a court must enforce the plain and unambiguous terms of a trust as they are written." *Id.*

In *In re Casey Estate*, 306 Mich App at 256-257, this Court distilled the rules of statutory construction as follows:

> The paramount rule of statutory interpretation is that we are to effect the intent of the Legislature. To do so, we begin with the statute's language. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we enforce the statute as written. In construing a statute, this Court should give every word meaning, and should seek to avoid any construction that renders any part of a statute surplus or ineffectual. It is well established that to discern the Legislature's intent, statutory provisions are not to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole. [Quotation marks and citations omitted.]

## C. BASIC PRINCIPLES – PUBLIC POLICY REGARDING TRUSTS

Under the Michigan Trust Code (MTC), MCL 700.7101 *et seq*., "[e]xcept as otherwise provided in the terms of the trust, . . . [the MTC] governs the duties and powers of a trustee, relations among trustees, and the rights and interests of a trust beneficiary." MCL 700.7105(1). "A trust may be created only to the extent its purposes are lawful, not contrary to public policy, and possible to achieve." MCL 700.7404. In general, "a trust terminates to the extent the trust is revoked or expires pursuant to its terms, no purpose of the trust remains to be achieved, or the purposes of the trust have become impossible to achieve or are found by a court to be unlawful or contrary to public policy." MCL 700.7410(1).[22] In *Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002), our Supreme Court discussed the concept and parameters of public policy:

---

[22] MCL 700.7410(2) provides, in part, that "[a] proceeding to confirm the termination of a trust under subsection (1) . . . may be commenced by a trustee or beneficiary." And a "trustee" is defined as "includ[ing] an original, additional, or successor trustee, whether or not appointed or confirmed by the court." MCL 700.1107(o). Denice was named as a successor trustee for nearly 20 years under the Trust, up until the execution of the 2020 Trust, the legal validity of which she challenged. Under these circumstances, I conclude that Denice had standing to pose an argument under MCL 700.7410(1). If I am in error in my construction of MCL 700.7410, my position can nonetheless stand solely on MCL 700.7404.

In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law. The public policy of Michigan is *not* merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law. There is no other proper means of ascertaining what constitutes our public policy. [Citation omitted.]

## D. DISCUSSION

At its core, Denice's appeal assails the 2020 Trust on the grounds that it amounted to fraud on marital assets, a violation of public policy, and a breach of fiduciary duty. Reformation of the 2020 Trust and imposition of a constructive trust are simply different equitable remedies to address the alleged fraud and fiduciary-duty breach. See *In re Filibeck Estate*, 305 Mich App 550, 552; 853 NW2d 448 (2014) ("A constructive trust is an equitable remedy created not by intent or by agreement, but by the operation of law"); *Johnson Family Ltd Partnership*, 281 Mich App at 377 (reformation is an equitable remedy). And the asserted public policy violation is primarily premised on the claim of fraud on marital assets, supporting, according to Denice, statutory relief in the form of an order invalidating or terminating the 2020 Trust. With respect to my analysis, I will not take into consideration the alleged 2018 agreement between Denice and Earl regarding lifetime income because doing so would effectively exceed the scope of the order granting the delayed application for leave to appeal. See *People v Farquharson*, 274 Mich App 268, 279; 731 NW2d 797 (2007) (an appeal on leave granted is limited to the scope of this Court's order granting leave). Denice is not entitled to appellate review of her claims that relied on the asserted 2018 agreement.

The term "marital assets" is indisputably linked to divorce litigation.[23] And it is certainly true that identifying an asset as "marital" does not speak to the legal title or formal ownership of

---

[23] In divorce actions, a trial court is required to include in a judgment "a determination of the property rights of the parties[.]" MCR 3.211(B)(3). Also, the court must determine "the rights of the parties in pension, annuity, and retirement benefits[.]" MCR 3.211(B)(2). A trial court has the authority to divide the property that came to either party by reason of the marriage. See MCL 552.19. A court normally cannot divide property between the spouses when the property belongs to one spouse as his or her separate property. See *Korth v Korth*, 256 Mich App 286, 291; 662 NW2d 111 (2003). "Thus, the trial court's first consideration when dividing property in divorce proceedings is the determination of marital and separate assets." *Reeves v Reeves*, 226 Mich App 490, 493-494; 575 NW2d 1 (1997). The distinction between marital assets and separate assets has long been recognized in this state. *Id.* at 494. A trial court, when apportioning marital property, must strive to equitably divide increases in marital assets that occurred from the beginning of the marriage to its end. *Id.* Marital property is property that was acquired or earned by the parties during the marriage and, with certain exceptions, separate property is property that either spouse obtained or earned before the marriage. *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). An increase in the value of separately owned property during a marriage

the property. See *Wengel v Wengel*, 270 Mich App 86, 93; 714 NW2d 371 (2006) (discussing various forms of concurrent ownership).[24]  Although Hunter devotes considerable time arguing that "marital assets" are not pertinent to probate proceedings, I conclude that the designation of an asset as "marital" should play an important role in resolving this appeal under the unique circumstances of the case.

With respect to fraud and the management or handling of marital assets, our Supreme Court in *Goddard v Goddard*, 286 Mich 553, 557; 282 NW 241 (1938), explained that it is within the authority of a divorce court to set aside a transaction consummated through the fraud of one spouse on the other spouse "and to equitably adjust their property rights . . . the same as though such fraudulent conveyance had not been made." A court has the power to gauge and determine whether assets were fraudulently transferred or conveyed to a third party in an effort to deprive a spouse of an interest in marital property. *Thames v Thames*, 191 Mich App 299, 302; 477 NW2d 496 (1991). The *Thames* panel specifically held that "[o]ne spouse cannot deprive the other of an interest in the marital estate by transferring marital property into a trust for the benefit of a third party." *Id.*[25] Taking a glance at a foreign jurisdiction's analysis on the subject, in *Carmack v Carmack*, 603 SW3d 900, 910-911 (Mo App, 2020), the Missouri court, discussing the marital fraud factors that Denice wishes us to embrace and adopt, observed:

> [Caselaw] identifies several factors that are relevant to determining whether a transferring spouse had the intent and purpose to defeat the other spouse's marital rights, including: (1) whether the transfer lacked consideration; (2) whether transferor-spouse retained control over the asset in question; (3) whether the amount of the transfer is disproportionate compared to the value of the transferor-

---

does not become a marital asset if the increase was not the result of either spouse's active efforts to improve the property's value. See *Dart v Dart*, 460 Mich 573, 585 n 6; 597 NW2d 82 (1999); *Reeves*, 226 Mich App at 496.

[24] Of course, Michigan does recognize a form of ownership known as an estate or tenancy by the entireties. See *Lilly v Schmock*, 297 Mich 513, 517; 298 NW 116 (1941). "In a tenancy by the entireties, a husband and wife hold joint title to real property with right of survivorship[,]" and "[a] deed or devise of real property to a husband and wife presumptively creates a tenancy by the entireties[.]" *In re VanConett Estate*, 262 Mich App 660, 667; 687 NW2d 167 (2004) (citation omitted). This is distinct, however, from property simply characterized as a "marital asset" under divorce law.

[25] In *Cassidy v Cassidy*, 318 Mich App 463, 495; 899 NW2d 65 (2017), this Court stated:

> [W]hile the general rule is that the circuit court has no jurisdiction in a divorce proceeding to adjudicate the rights of any party other than the husband and wife and Michigan divorce statutes do not permit the courts to order conveyance of property or interests in property to third parties, one exception exists where a third party has conspired with a husband or a wife to defraud the other spouse out of his or her property rights. [Quotation marks, citation, and alteration brackets omitted.]

-17-

spouse's total estate; and (4) whether the transferor-spouse made the transfer openly and with frank disclosure.

As emphasized by Hunter, Earl did not actually convey or transfer any assets to Hunter or the Trust by executing the 2020 Trust and associated will; he merely disinherited Denice. At that point, Hunter obtained—or continued to have—a future contingent beneficial interest in the Trust, see MCL 700.7103(*l*)(*i*), that was susceptible to the whims of his father. Earl could have further amended or even revoked the Trust itself during his lifetime. But when Earl died in June 2020, the assets, if not already held by the Trust, became property of the Trust, and Hunter's interest as sole beneficiary vested. See *id.*

In this case, I agree with the majority that there is no genuine issue of material fact that Earl did not act fraudulently or with fraudulent intent when he signed the 2020 Trust. I would nonetheless hold that a public policy violation occurred and that it was unnecessary for the violation to entail fraud to justify equitable relief under the MTC. I acknowledge that Denice only argues that a violation of public policy occurred because Earl committed fraud on marital assets, but I conclude that justice requires examination of whether public policy was violated even absent any fraud. See *People v Yost*, 278 Mich App 341, 388; 749 NW2d 753 (2008) (" 'Generally we do not address issues not raised by the parties on appeal. However, our function is to dispense justice, and we are given the limited power to raise questions on our own.' ") (quoting *People v Noel*, 88 Mich App 752, 754; 279 NW2d 305 [1979]). Sua sponte examination is appropriate. I also note that the allegations in Count III of the petition raising the claim of a public policy violation were sufficiently broad so as to go beyond solely a fraud-based theory.

With respect to public policy, MCL 700.7404 provides, as cited earlier, that "[a] trust may be created only to the extent its purposes are lawful, *not contrary to public policy*, and possible to achieve." (Emphasis added.) I disagree with any argument that MCL 700.7404 only applied to the Trust as originally "created" in 2001. The 2020 Trust was a complete restatement of the Trust. Moreover, it is clear that the intent of the Legislature in crafting MCL 700.7404 was to prohibit the enforcement of a trust that is unlawful or in violation of public policy at any point throughout the life of the trust. And MCL 700.7410(1) provides, in relevant part and as previously noted, that "a trust terminates to the extent . . . the purposes of the trust . . . are found by a court to be unlawful or contrary to public policy."[26]

It is beyond peradventure that under Michigan law "[t]he goal in distributing marital assets in a divorce proceeding is to reach an *equitable distribution* of property in light of all the circumstances." *Berger v Berger*, 277 Mich App 700, 716-717; 747 NW2d 336 (2008) (emphasis added); see also *Seifeddine v Jaber*, 327 Mich App 514, 522; 934 NW2d 64 (2019); *Butler v Simmons-Butler*, 308 Mich App 195, 208; 863 NW2d 677 (2014); *Hodge v Parks*, 303 Mich App 552, 560-561; 844 NW2d 189 (2014); *Gates v Gates*, 256 Mich App 420, 423; 664 NW2d 231 (2003). Because, as stated earlier, Michigan public policy can be ascertained by reflection on the common law, *Terrien*, 467 Mich at 66-67, I conclude that public policy favors the equitable division of marital assets in divorce litigation. This is hardly debatable. Furthermore, I conclude

---

[26] The terms of a trust *cannot* prevail over the requirements of and provisions in MCL 700.7404 and MCL 700.7410. MCL 700.7105(2)(c) and (d).

that unilaterally disinheriting a spouse is contrary to Michigan public policy that favors the protection of a surviving spouse as evidenced by MCL 700.2202(2), which allows a surviving spouse to take an elective share of the decedent spouse's estate despite the existence of a will disinheriting the spouse. See *Terrien*, 467 Mich at 66-67 (public policy can be discerned by taking into consideration Michigan statutes).[27]

Under the particular circumstances presented in this case, I find it appropriate to consider the public policy of equitably dividing marital assets in divorce proceedings, which were not concluded for the sole reason of Earl's untimely and unfortunate death, *in conjunction with* the public policy that favors the protection of surviving spouses and disfavors their disinheritance. On the authority of MCL 700.7404 and MCL 700.7410(1), I would hold that the revocable, *inter vivos* Trust executed by Earl during the divorce proceedings terminated or was rendered void at the time of his death because the purpose of the Trust had become contrary to public policy to the extent that the Trust held, was the beneficiary of, or otherwise pertained to "marital assets" that would have otherwise been equitably divided in the divorce proceedings had Earl survived until entry of judgment.

Under my analysis, there was no public policy violation by Earl at the point that he executed the 2020 Trust. As noted earlier, there was no actual conveyance at that time, and if the divorce action would have proceeded to judgment, which would have necessarily included a division of the marital assets, the 2020 Trust would have had no effect on the assets or monies awarded to Denice. In other words, colloquially speaking, no harm no foul. And to be absolutely clear, my approach would not bar enforcement of the 2020 Trust with respect to any "separate" property held by Earl that was not part of the marital estate and that would not have been subject to division in the divorce case.[28]

Next, I conclude that this Court's ruling in *Soltis* and the Supreme Court precedent cited in *Soltis* do not conflict with my position. In *Soltis*, Richard and Dora Soltis, a married couple, each set up their own revocable, *inter vivos* trusts and pour-over wills, which they amended over the years. *Soltis*, 203 Mich App at 436-437. In time, Richard transferred his interests in marital property to Dora's trust to avoid alimony demands made by his former wife. *Id.* at 437. At one

---

[27] I also note that regardless of any effort to disinherit a spouse, the surviving spouse is entitled to certain personal property under MCL 700.2404. Subsection (1) of MCL 700.2404 provides that "[t]he decedent's surviving spouse is . . . entitled to household furniture, automobiles, furnishings, appliances, and personal effects from the estate up to a value not to exceed $10,000.00 more than the amount of any security interests to which the property is subject." Additionally, "[a] decedent's surviving spouse is entitled to a homestead allowance of $15,000.00, adjusted as provided in section 1210." MCL 700.2402. Furthermore, "[f]or their maintenance during the period of administration, a reasonable family allowance is payable to the decedent's surviving spouse . . . ." MCL 700.2403(1). These statutory provisions lend further support for the proposition that public policy does not support the disinheritance of a surviving spouse.

[28] I do note that "separate" property can be invaded by a court under certain statutory circumstances when dividing property in a divorce action. See *Reed v Reed*, 265 Mich App 131, 152; 693 NW2d 825 (2005), citing MCL 552.23(1) and MCL 552.401.

point, Richard and Dora's son from a previous marriage, Brian, were beneficiaries of Dora's trust. *Id.* at 436-437. The following then occurred:

> In August 1987, Dora again amended her trust providing that all of the income go to Brian. Richard was eliminated as a beneficiary of the trust, with no explanation given in the trust itself. However, Richard has conceded that he was financially secure. Further evidence indicated that Dora, who had cancer at the time, wanted to guard against her incapacity, wished to provide for her son and grandson, and wished to prevent Richard's ex-wife from attaching Dora's property. Dora subsequently died of cancer on August 21, 1989. [*Id.* at 437.]

Richard argued to this Court that the assets in Dora's trust should be included in her probate estate for purposes of the spousal election statute, that the trust was illusory and testamentary, and that the trust constituted "a fraud on his marital rights" and was thus invalid. *Id.* at 438. The *Soltis* panel first confronted Richard's arguments about the trust being illusory and testamentary and undermining the spousal election statute:

> An *inter vivos* trust, as in this case, is a trust created between the living. It is a trust created by the grantor during the grantor's lifetime to go into effect during the grantor's lifetime. An *inter vivos* trust is contrasted with a testamentary trust in that a testamentary trust is contained in a will and goes into effect at the testator's death. An *inter vivos* transfer or gift is not testamentary and is therefore not subject to the spousal election.
>
> [Richard], however, argues that the trust is testamentary in character because decedent [Dora] retained substantial control over the trust assets during her life by declaring herself trustee and by retaining the power to amend or revoke the trust. The reservation of the power to revoke the trust does not render it testamentary, nor does it void the trust. *Goodrich v City Nat'l Bank & Trust Co*, 270 Mich 222, 229; 258 NW 253 (1935). Further, a grantor may establish a trust naming herself as the trustee and receive the income generated by the principal held for the benefit of another. Thus, the trust is not testamentary in character merely because decedent retained substantial control over the trust.
>
> [Richard] further argues that the trust is illusory because decedent has, in effect, defeated his statutory elective share by removing the property from the estate. Courts in other jurisdictions have found such *inter vivos* trusts to be illusory, and therefore invalid, where the grantor in effect defeated the statutory elective share of the spouse by removing the property from the estate while allowing the grantor to retain control over the assets in the trust. However, under similar facts, our Supreme Court has rejected a spouse's attempt to invalidate such a trust on the ground that it was illusory. In *Goodrich*, *supra*, our Supreme Court upheld a trust where the grantor reserved power to change the beneficiaries, amend the trust, revoke the trust in whole or in part, withdraw all or part of the estate, and control investments. In *Rose v Union Guardian Trust Co*, 300 Mich 73; 1 NW2d 458 (1942), our Supreme Court indicated that the fact that the grantor makes certain reservations in creating the trust does not necessarily affect the validity of the trust.

Accordingly, following the dictates of *Goodrich* and *Rose*, we find that the trust in the instant case is not testamentary or illusory. [*Soltis*, 203 Mich App 439-440 (citations omitted).]

The *Soltis* panel next addressed and rejected Richard's contention that the trust constituted a fraud on his marital rights or assets, concluding that there was "no indication that decedent intended to defraud [Richard] of his marital rights." *Id.* at 440. This Court reached that conclusion because Richard "was at all times independently financially secure" and because there was evidence that Dora desired to amend her trust to guard against her incapacity related to her cancer, provide for her son Brian and grandson, and to prevent Richard's ex-wife from attaching the property. *Id.* The Court found that "[t]hese purposes are valid and do not indicate any intent to defraud [Richard] of his marital rights." *Id.* The *Soltis* panel additionally elaborated:

We further note that the Probate Code was amended by the Legislature in 1979 and the augmented estate concept of the Uniform Probate Code . . ., which would include in the decedent's estate any transferred property in which the decedent retained the power to revoke the transfer or the right to enjoy, consume, invade, or dispose of the property for the decedent's own benefit or retain a right to income, was specifically not included in the Revised Probate Code [RPC[29]] . . . . Thus, although it is clear that an *inter vivos* trust circumvents the purpose of the spousal election provision to financially provide for living spouses, the spousal election provision does not include the concept of an augmented estate.

We are aware that spouses who may not be as financially secure as the petitioner in the instant case may effectively be disinherited by the use of an *inter vivos* trust because of the language of the spousal election statute and the Supreme Court's decisions in *Goodrich* and *Rose*. However, we are bound by the Supreme Court's decisions because only the Supreme Court may modify or overrule its prior decisions. Additionally, the Legislature could have provided for an augmented estate in the spousal election statute, but it chose not to do so and we must also follow the dictates of our Legislature through its statutes. Absent any showing of fraud upon petitioner's marital rights, we must conclude that decedent's assets in the *inter vivos* trust do not fall within the spousal election provision. [*Soltis*, 203 Mich App at 440-441 (citations omitted).[30]]

In *Goodrich*, the settlor husband placed bonds, stocks, and mortgages into a trust with a trustee bank because "[h]e was concerned about his wife's intense devotion to a church, and was afraid she would make excessive donations to the denomination to her own disadvantage."

---

[29] The RPC, 1978 PA 642, was replaced by the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, 1998 PA 386. See *In re Pollack Trust*, 309 Mich App 125, 143 n 4; 867 NW2d 884 (2015). The relevant provisions of the MTC, MCL 700.7404 and MCL 700. 7410, were enacted pursuant to 2009 PA 46.

[30] The last sentence in this passage from *Soltis* can be interpreted as supporting a claim of fraud on marital assets through the use of a revocable, *inter vivos* trust if in fact there is evidence of fraud.

*Goodrich*, 270 Mich at 224. The husband did not place any real property or all of his personal property in the trust. *Id.* at 224-225. He died within a couple of years, and his wife died nine months later, leading to her heirs challenging the validity of the trust on multiple grounds in litigation against the bank. *Id.* The heirs asserted that the husband's "property devolved upon his wife at his death and her heirs take through her." *Id.* at 225. The trust had been set up to provide the husband with income generated by the trust's assets for his lifetime, to provide lifetime income thereafter for the wife, to provide, upon both of their deaths, $600 each to a couple of the heirs, and to provide the balance for the use and benefit of a charitable organization named by the husband. *Id.* at 227. Under the terms of the trust, the husband had full authority to amend and revoke the trust, change the beneficiaries, and control the investments. *Id.* at 226, 229. The Supreme Court, in finding the trust valid and enforceable and not testamentary, stated that "[i]t is plain that [the husband] wanted to make a living trust for his own benefit during his lifetime because of his ailments, to insure certain beneficiaries of his bounty, and to prevent undesired disposition of his estate by his wife. In providing the reservations, he was merely setting up not uncommon safeguards against future contingencies." *Id.* at 232. The Court concluded the opinion by addressing a public policy argument:

> [The heirs] further urge that instruments of this nature are contrary to public policy because they would offer a means of evasion of state and federal estate inheritance taxes or inconvenience their collection. The government has ample authority to conserve its power of taxation. It can, and must, and does, provide against evasion. Trusts may have different private and public effect. There is no occasion for the courts to avoid private rights in aid of the collection of taxes by setting up conditions which the Legislature did not deem necessary. [*Id.* (citation omitted).]

In *Rose*, 300 Mich at 74-75, the Michigan Supreme Court addressed the following factual circumstances:

> This appeal involves the validity of a trust instrument which Benjamin Rose executed October 26, 1927, about a week prior to his marriage to plaintiff, Clara B. Rose. Benjamin Rose died testate September 16, 1933. Plaintiff renounced the provisions made for her in his will, and elected to take under the statute. Incident to creating this trust Mr. Rose conveyed eight parcels of land to the predecessor of the Union Guardian Trust Company. The deeds were recorded within two days. He changed the beneficiaries named in the trust instrument by means of a supplemental agreement on August 13, 1932, under which defendant Ethel Alice Rose, his daughter by a former marriage, was to receive the trust property outright as beneficiary at his death. By her bill of complaint plaintiff sought cancellation of the deeds through which Mr. Rose conveyed title in trust to the parcels of real estate to the defendant trust company, and also cancellation of the two deeds by which the trust company after the death of Mr. Rose sought to convey title to defendant Ethel Alice Rose. The circuit judge decreed to plaintiff the relief sought. Defendant Ethel Alice Rose has appealed.

Pertinent to our case, one of the arguments made on appeal in *Rose* was that "the trust was set up by Benjamin Rose shortly before his marriage to plaintiff in an effort to fraudulently deprive

her of her dower rights[.]" *Id.* at 75. Our Supreme Court rejected the argument, concluding that the record demonstrated that Benjamin had liberally provided for the plaintiff by transferring a large part of his property to her during his lifetime by means of joint deeds and joint bank accounts. *Id.* at 75-76. The Court ruled that no fraud was shown, noting "that conveyances of property immediately prior to marriage are not per se fraudulent in Michigan." *Id.* at 76.

It is clear that *Soltis*, *Goodrich*, and *Rose* provide authority for a person to disinherit his or her spouse through the employment of a revocable, *inter vivos* trust. There was, however, some emphasis in all three cases that the surviving spouse was not totally disinherited or was left financially secure. See *Rose*, 300 Mich at 75-76; *Goodrich*, 270 Mich at 224-225; *Soltis*, 203 Mich App at 440. I reject, for the most part, Denice's argument that the three cases are no longer pertinent because the public policy provisions in the MTC were enacted after those opinions were issued. Although the statutory language found in the MTC regarding the requirement that trusts not violate public policy did not exist when *Soltis*, *Goodrich*, and *Rose* were decided, public policy under the common law still provided an avenue to challenge a trust. See *Goodrich*, 270 Mich at 232 ("Plaintiffs further urge that instruments of this nature are contrary to public policy . . ."). Indeed, the *Soltis* panel's discussion regarding whether the trust in that case was "illusory" and its recognition that the trust circumvented the statutory spousal election provision resulting in a spouse's disinheritance effectively constituted a public policy analysis. Nevertheless, I do not read *Soltis*, *Goodrich*, and *Rose* as undermining my conclusion that Michigan public policy favors the protection of surviving spouses and does not favor their disinheritance; rather, they merely support the proposition that the public policy against disinheritance did not suffice to render the trusts unenforceable. Ultimately, the distinguishing feature presented in the instant case is that it not only entailed the disinheritance of a spouse, it involved a disinheritance during the pendency of a divorce action with respect to marital assets that would have otherwise been equitably divided upon judgment but for a spouse's death. This compelling aspect of the case is not at all comparable to the circumstances presented in *Soltis*, *Goodrich*, and *Rose.*

Finally, I acknowledge that *Soltis* did indicate that the trust in that case was valid and enforceable in light of the absence of a statutory provision in the now-repealed RPC allowing for spousal election in the context of an augmented estate encompassing trust property. *Soltis*, 203 Mich App at 440-441. But, although EPIC similarly lacks any such provision and the MTC, which is not focused on probating estates, does not contain any specific spousal election language, I conclude that the MTC's prohibition against trusts that violate public policy constitutes statutory authority for taking into consideration EPIC's spousal election and spousal allowance provisions in defining the parameters of Michigan public policy.

## IV. CONCLUSION

On the authority of MCL 700.7404 and MCL 700.7410(1), I would hold that the revocable, *inter vivos* Trust executed by Earl during the divorce proceedings terminated or was rendered void at the time of his death because the purpose of the Trust had become contrary to public policy to the extent that the Trust held, was the beneficiary of, or otherwise pertained to "marital assets" that would have otherwise been equitably divided in the divorce proceedings had Earl survived until entry of judgment. I reach this conclusion regardless of whether Earl had an intent to defraud Denice. I do agree with the majority that any claims for equitable relief based on breach of

-23-

fiduciary duty and fraud on marital assets fail as a matter of law.  Thus, I would affirm in part and reverse in part.  Accordingly, I respectfully concur in part and dissent in part.

/s/ Jane E. Markey